v.

STATE of Alaska, Appellee.

No. S–9722.

Supreme Court of Alaska.

June 21, 2002.

J.S., pro se, Anchorage, and Gayle J. Brown, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Alan L. Schmitt, Kodiak, Guardian Ad Litem.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Jack's [1] parental rights were terminated as to his sons Avery, Lyle, and Carl after Jack was convicted of five counts of sexual abuse against them. Jack claims several errors were made by the superior court. Because we find that the superior court did not need to require active efforts under the Indian Child Welfare Act, we uphold the termination of Jack's parental rights.

## II. FACTS AND PROCEEDINGS

### A. Facts

This case involves the termination of Jack's parental rights to his three sons: Avery, Lyle, and Carl. Avery was born in June 1988. Lyle and Carl, twins, were born in June 1989. Custody of the boys appears to have been transferred to Jack on September 7, 1989 after the state petitioned to have the boys removed from their mother's custody when the twins tested positive for cocaine at birth. During the first several years of the twins' life, custody apparently went back and forth between the mother and Jack. Between January 1, 1994 and January 25, 1996, the boys lived with Jack in Kodiak.

The Division of Family and Youth Services (DFYS) removed the boys from Jack's care on January 25, 1996 due to reports to the

---

1. Pseudonyms have been used throughout this opinion for all family members.

Kodiak police department and DFYS case worker, Mary Gray, by the boys' mother and other relatives, that Jack was sexually abusing all three boys. Jack was charged with eight counts of engaging in acts of sexual contact and sexual penetration including fellatio, digital anal penetration, and penile anal penetration. A jury convicted Jack of four counts of first-degree sexual abuse of a minor and one count of second-degree sexual abuse of a minor, counts which involved all three boys. Jack was sentenced to nineteen years with four years suspended. Also, as conditions of parole, Jack was ordered not to have contact, direct or indirect, with his sons or his own sisters, or their families, without prior written approval of the parole officer. Jack was also ordered not to have contact with any minor children under the age of sixteen without the approval of the parole officer. The court of appeals upheld Jack's conviction in its entirety.

After their removal from Jack's custody, the boys were placed in emergency custody. DFYS attempted to place the boys with their mother after her promise to remain clean and sober. The mother moved with the boys into a local women's shelter but abandoned them sometime during the night of February 4, 1996. After their mother's abandonment, the boys were placed in foster care and then placed with their aunt Cara on March 22, 1996. The boys remained with Cara until she informed DFYS that they had to be moved due to their inappropriate sexual behavior with each other and her own children. The boys have since been placed in separate foster homes. The mother's parental rights were terminated on August 24, 1999.

### B. Proceedings

The state petitioned to have the boys declared children in need of aid on January 26, 1996. The superior court delayed the proceedings on several occasions pending resolution of Jack's criminal charges. The boys were adjudged children in need of aid under AS 47.10.010(4) by the superior court on January 7, 1997. Also on that date the superior court granted the state's motion for summary judgment, holding that Jack was collaterally estopped from denying that he sexually abused his children in light of his criminal conviction. In January 1999 DFYS petitioned for termination of Jack's parental rights as to all three boys. Jack moved to have the boys declared Indian children for the purposes of the Indian Child Welfare Act (ICWA). Preliminary hearings were held in front of Superior Court Judge Donald D. Hopwood on January 26, 1996 and Standing Master Anna M. Moran on February 2, February 17, May 4, and May 20, 1999. The termination proceeding was held May 25–27, 1999 before Standing Master Moran.

The Muscogee (Creek) Nation moved to intervene in the proceedings under ICWA and that motion was granted by Standing Master Moran. In accordance with Standing Master Moran's findings, the superior court found, beyond a reasonable doubt, that termination of Jack's parental rights was appropriate under AS 47.10.080(o) given the length of his incarceration and the needs of the children. These findings were based on the testimony of six expert witnesses and a social worker.

However, the superior court found that it was uncontroverted that the state failed to offer any type of active remedial or rehabilitative services to Jack as required by ICWA. The superior court found that for rehabilitation to occur, Jack would have to admit that he sexually abused his children and enroll in a sex offender treatment program. The superior court held the record open for sixty days in order to allow the state to develop and offer a treatment plan to Jack; and ruled that if Jack failed to accept the plan during this time his parental rights would be terminated.

The state developed a case plan that included the requirement that Jack admit to charges I through VIII of his March 28, 1996 indictment, openly take full responsibility for his behavior, write a letter of apology to each of his three sons involved in the termination proceedings, direct his attorneys to terminate all appeals of his criminal case, and enroll and be accepted into a sex offender treatment program. Jack rejected the proposed case plan because it required him to admit to the sexual abuse of his sons and

because it required him to cease his criminal appeals.

The superior court ordered the matter to be heard by Standing Master Moran for additional findings on the issue of the state's compliance with the August 24, 1999 order. Standing Master Moran found that the state's case plan satisfied ICWA's remedial measures requirement and recommended termination of Jack's parental rights in December 1999. In January 2000 the superior court approved a stipulation between the state and the Muscogee Creek representatives noting that DFYS contacted all of the boys' relatives, that no family members were willing or capable of caring for the boys, and that no families meeting the preference requirements of § 1915(a) of ICWA were found after diligent effort by DFYS. The superior court issued an order in accordance with the findings of Standing Master Moran in May 2000.

Jack now appeals the decision of the superior court terminating his parental rights.

## III. STANDARD OF REVIEW

 We will affirm a trial court's factual findings in cases of termination of parental rights "unless those findings are clearly erroneous."[2] A finding of fact is clearly erroneous when we are left with a definite and firm conviction based on the entire record that the trial court has made a mistake.[3] It is a mixed question of law and fact as to whether the state has complied with the "active efforts" requirement of ICWA.[4] We will defer to the trial court's factual findings under the "clearly erroneous" standard and review de novo any questions of law.[5] "Whether the factual findings are sufficient to satisfy the [CINA] rules is a question of law" that we will review de novo.[6] Constitutional questions are questions of law for which we will substitute our own judgment.[7] We will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[8]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Terminating Jack's Parental Rights Because Active Efforts Were Not Required under ICWA.

 Jack argues that the proposed case plan offered by the state in response to the superior court's August 24, 1999 order did not comply with ICWA's requirement that active efforts be made to rehabilitate a family prior to the termination of parental rights. The state and the guardian ad litem (GAL) argue that the active efforts requirement was complied with. The state and the GAL also argue that ICWA should be interpreted as not requiring active efforts once a family is irrevocably sundered by parental sexual abuse.

 The Indian Child Welfare Act requires the state to prove "active efforts ... to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[9] We decide whether active efforts have been made on a case-by-case basis.[10] Generally, the state's duty under the active efforts requirement is not affected by a parent's motivation or prognosis before remedial efforts have commenced.[11] We have previously held that "[n]either incarceration nor doubtful prospects for rehabilitation will relieve the State

2. A.A. v. State, Dept. of Family & Youth Servs., 982 P.2d 256, 259 (Alaska 1999).

3. Dingeman v. Dingeman, 865 P.2d 94, 96 (Alaska 1993).

4. A.A., 982 P.2d at 259.

5. Id.

6. T.F. v. State, Dep't of Health & Soc. Servs., 26 P.3d 1089, 1092 (Alaska 2001).

7. Sonneman v. Knight, 790 P.2d 702, 704 (Alaska 1990).

8. Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

9. 25 U.S.C. § 1912(d).

10. N.A. v. State, Div. of Family & Youth Servs., 19 P.3d 597, 603 (Alaska 2001).

11. A.A. v. State, Dept. of Family & Youth Servs., 982 P.2d 256, 261 (Alaska 1999).

of its duty under ICWA to make active remedial efforts."[12]

However, the enactment of the Adoption and Safe Families Act of 1997[13] (ASFA) convinces us that it is the policy of Congress to not require remedial measures in situations where a court has determined that a parent has subjected his or her child to sexual abuse. This enactment[14] amended 42 U.S.C. § 671 so as not to require reasonable efforts to be made to preserve the family when "a court of competent jurisdiction has determined that . . . the parent has subjected the child to aggravated circumstances," which includes sexual abuse.[15] Although this case is not governed by ASFA, that act is useful in providing guidance to congressional policy on child welfare issues. It suggests that in situations of adjudicated devastating sexual abuse, such as this one, a person's fundamental right to parent is not more important than a child's fundamental right to safety. Therefore, we hold that active efforts to reunify the abusing parent are not required in a situation after there has been a judicial determination that the parent has subjected the child to sexual abuse.

Because the superior court could find the state's active efforts duty was discharged when Jack was convicted of sexually abusing his children, the superior court did not err in terminating his parental rights.[16]

### B. The Superior Court Did Not Err in Qualifying the Expert Witnesses.

Jack argues that the superior court erred when it qualified experts that were without special knowledge of social and cultural aspects of Native life. In *L.G. v. State, Department of Health and Social Services*,[17] we stated that "so long as a termination proceeding does not implicate cultural bias, ICWA's proof requirements can be satisfied by a qualified expert witness without any special familiarity with Native cultural standards."[18] We went on to state that "where there is clear evidence that a child faces a serious risk of physical neglect if she [or he] remains in [the] parent's care, a trial judge may terminate parental rights without hearing testimony from an expert in Native cultures."[19] Jack has offered no evidence that the issue of cultural bias was raised at trial.

During the course of the termination proceedings, five experts testified as to the risk to the boys if Jack's parental rights were not terminated. The therapists for all three boys (four therapists in total) testified that the boys could not be transitioned back into Jack's custody without substantial emotional harm. In addition, all four therapists testified that the boys would suffer severe emotional distress if they were required to leave the respective foster families to which they had bonded. Therefore, the superior court did not err in terminating Jack's parental rights without hearing testimony from an expert on Native life because cultural issues were not implicated in the proceedings and there was sufficient expert testimony that the boys could suffer severe emotional harm if Jack's parental rights were not terminated.

---

12. *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled on other grounds, Matter of S.A.*, 912 P.2d 1235, 1239 (Alaska 1996); *see also A.B.M. v. M.H. & A.H.*, 651 P.2d 1170, 1173 (Alaska 1982) (holding that there was no compelling reason for implying a judicially created exception to ICWA).

13. Pub.L. No. 105–89, 111 Stat. 2115 (1997) (codified as amended in scattered sections of 42 U.S.C.). This provision of the federal act has been adopted in Alaska as AS 47.10.086(c)(1).

14. *Id.* at § 101.

15. 42 U.S.C. § 671(a)(15)(D)(i) (2001). We note that the Alaska Legislature has adopted this exception to the reasonable efforts requirement in regard to children in need of aid in AS 47.10.086(c).

16. Jack also argues on appeal that, by requiring him to admit to charges I through VIII of his criminal indictment in order to prevent the termination of his parental rights, the state violated his constitutional right against self-incrimination and that the superior court erred in giving the state time to comply with ICWA. Because we hold that the state was not required to make active efforts, it is unnecessary to reach these two issues.

17. 14 P.3d 946 (Alaska 2000).

18. *Id.* at 953.

19. *Id.*

## C. The Superior Court Did Not Lack Jurisdiction.

 Jack argues that the superior court lacked jurisdiction because violations of law occurred during the proceedings. ICWA provides for the transfer of termination proceedings to the tribal court to which the children belong in some circumstances.[20] However, Jack does not seem to be arguing here, nor did he argue in the superior court, that jurisdiction be transferred to the Muscogee tribal court. Instead, he argues that proceedings should be terminated and the boys returned to their "Indian Custodians." Jack's "Motion to Move Superior Court to: Declination of Jurisdiction: and Forthwith Return of Child to Indian Custodian" appears to be a motion to dismiss the proceedings in their entirety. Also pertinent is the fact that the Muscogee Tribe representatives signed a stipulation, that was approved by the superior court, that the tribe was contacted regarding the stability of the current placements and that the tribe is in agreement with the state's handling of the situation, including the boys' placement with non-Native families. There is evidence that the Muscogee Tribe reserved the right to petition that the proceedings be transferred to the tribal court but there is no indication that a petition was ever filed. Also, a petition for removal under U.S.C. § 1911 was never filed. Therefore, the superior court had jurisdiction over these termination proceedings.[21]

## D. The Superior Court Did Not Err in Upholding the State's Placement of the Children Outside of ICWA Preferences.

Jack argues that the state failed to follow ICWA's placement requirements because there were family members of Jack who were willing to take the boys but who were never contacted by the state.[22] Jack argues that his brother, Aaron, was willing to take the children, as was Jack's sister, Lilly. Jack also argues that the state failed to inquire about any extended family that may be able to take the boys.

 DFYS case worker Mary Gray testified that she contacted the Kodiak Area Native Association in order to find foster placement for the boys on several occasions but that there was never a Native family available. Gray also testified that the boys were placed with their aunt, Cara, but that did not work out. Gray then contacted the boys' other aunt, Lilly, but after some communications between Lilly and DFYS, Lilly decided that she should not take care of the boys. Also, Gray testified that she had a meeting with Jack in the summer of 1998 but that Jack did not offer the names of any relatives who could care for the boys and that she had never heard of Jack's brother, Aaron, until he appeared on the witness list in the proceedings. Furthermore, the Muscogee Tribe representatives signed a stipulation stating

**20.** 25 U.S.C. § 1911(b) (2000) provides in relevant part:

(b) Transfer of proceedings; declination by tribal court

In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe.

**21.** AS 47.10.010(a).

**22.** 25 U.S.C. § 1915(b) (2000) provides:

(b) Foster care or preadoptive placements; criteria; preferences

Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

(i) a member of the Indian child's extended family;

(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

that the state worked in conjunction with the tribe to find placement with the boys' family pursuant to ICWA, that placement with relatives or other Native families was not available, and that good cause existed to deviate from ICWA preferences. The state complied with ICWA's preference guidelines. Therefore, the placement of the boys was not in error.

### E. The Superior Court Did Not Rule that Jack Was To Have No Direct or Indirect Contact with His Children.

Jack argues that the superior court erred when it found that he was not to have any contact with his children. Jack argues that this finding by the superior court was one of the reasons that his parental rights were erroneously terminated. There is no evidence that the superior court ever ordered Jack to have no contact with his children or based any orders in the termination proceedings on whether or not contact occurred. In fact, Jack's criminal conviction states that he was to have "[n]o contact, direct or indirect, with the victims ... without prior written approval of the Probation/Parole Officer." Therefore, the superior court did not order him to have no contact with his children; this was one of the many conditions of Jack's parole.

### F. The Superior Court Did Not Err in Denying Jack's Discovery Motions.

Jack argues that the superior court erred when it denied discovery of notes to an interview that Jack believes occurred between Mary Gray and the boys. Jack claims that he was denied discovery of these notes because Gray and the district attorney denied that this interview ever happened and the superior court agreed with the district attorney and Gray. The superior court granted Jack's discovery motion in part on February 11, 2000, allowing him access to any information that DFYS may have had about communications between DFYS and Lilly. The superior court issued another order on March 8, 2000 denying Jack's discovery request because this discovery request was covered by the court's previous order. In addition, DFYS proved that Jack received discovery of DFYS's entire file in this case. Therefore, the superior court did not deny Jack discovery; there was no error in connection with the superior court's discovery orders.

### G. The Superior Court Did Not Err in Finding Beyond a Reasonable Doubt that Placement with Jack Was Likely To Result in Serious Physical or Emotional Damage to the Children.

 Jack argues that the evidence presented to the superior court by the state was insufficient to meet the beyond a reasonable doubt standard required by ICWA.[23] Specifically, Jack argues that the expert witnesses did not have sufficient knowledge of the specific facts of this case. We have stated:

We do not hold that a meeting between the expert and the parties to the termination proceeding is required in every case. But the expert opinion should be based on the particular facts and issues of the case ... in order to support a finding, beyond a reasonable doubt, that serious physical or emotional harm will result.[24]

Jack was criminally convicted of sexually abusing the boys. The superior court was therefore justified in finding in the termination proceeding that this fact had been proven beyond a reasonable doubt. We turn now to the specific expert testimony that the state offered, and whether the expert opinions were sufficiently based on the particular facts of this case.

The first expert to testify was Pamela A. Robinson, who has a Bachelor of Science degree in sociology with a minor in psychology and a master's degree in counseling psy-

---

**23.** 25 U.S.C. § 1912(f) (2000) provides:
 (f) Parental rights termination orders; evidence; determination of damage to child
 No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of quali-

fied expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

**24.** *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1218 (Alaska 2001).

chology. She testified that prior to getting her master's degree she worked for twenty years in early childhood education and child development, and that she has been qualified as an expert in several other cases. At the time of her testimony, she had been counseling Carl for approximately one and one-half years. Upon the initial consultation, she diagnosed Carl with post-traumatic stress disorder, possible major depression, and adjustment disorder. She stated that she believed that Carl could not be transitioned back to Jack without causing Carl emotional harm.

The second expert to testify was Sandra Husted, who has a bachelor's degree in sociology and a master's degree in counseling. She stated that she was a Clinician II at Providence Mental Health Center in Kodiak from January 1998 until January 1999. At the time of the hearing, she had been licensed as a professional counselor in Texas for nine years. She had been qualified as an expert in psychotherapy and crisis emergency in previous court cases. She testified that she treated Avery from February of 1998 until November of 1998 during which time she saw him approximately every three weeks. She testified that Avery could not be transitioned away from his foster family and back to Jack because of the abuse perpetrated by Jack.

Dr. Robert B. Duthie testified next. He holds a Ph.D. in counseling and clinical psychology and has been board certified in forensic psychology since 1987. He stated that he had been qualified as an expert in at least 100 previous cases. He first met Lyle in June of 1998 and had been following the case ever since. He testified that Lyle had post-traumatic stress disorder arising from the sexual abuse by Jack. He also testified that Lyle could not successfully be placed back into custody with Jack without emotional harm and risk of continued sexual abuse because Jack has not received treatment nor apologized for the previous abuse.

The fourth expert to testify was Dr. Joseph M. Keville, who has a Bachelor of Science degree in social services and a Ph.D. in education; he has been a licensed psychologist in Massachusetts since 1973. He practices in the area of clinical child psychology.

He testified that he had treated approximately 1,000 children in the last ten years. He met with Avery on two occasions and testified that he thought that Avery would have a "severe depressive reaction" if he was forced to leave his foster family.

The fifth expert to testify was Dr. Ronald D. Howes, who has a bachelor's degree and master's degree in psychology and a Ph.D. in clinical psychology. He stated that he had completed over 2,000 hours of clinical internship in forensic psychology with the California Department of Corrections and is board certified in trauma psychology with specialties in sex therapy and treatment of sex addictions. He had testified as an expert in court on numerous occasions. He stated that the recidivism rate for a sex offender increased in cases with same gender sexual abuse, lack of a strong family member supervising the family, and where the abuse was not admitted to by the offender. He stated that, given the situation in this case, the rate of recidivism would be over fifty percent.

There was substantial testimony by experts with personal knowledge of the facts of this case and an expert with substantial expertise in sex offender treatment. The superior court's finding beyond a reasonable doubt that placement with Jack would result in serious emotional damage to the boys was therefore not clearly erroneous.

## V. CONCLUSION

We AFFIRM the termination of Jack's parental rights.