208 P.3d 156 (2009)
LARRY W., Appellant,
v.
STATE Of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Office of Children's Services, Appellee.
No. S-13072.
Supreme Court of Alaska.
February 25, 2009.
*157 G. Blair McCune, Anchorage, for Appellant.
Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Talis J. Colberg, Attorney General, Juneau, for Appellee.
Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

MEMORANDUM OPINION AND JUDGMENT[*]

I. INTRODUCTION
Larry W. appeals the superior court's termination of Larry's parental rights to his daughter, Jenna W.[1] Larry argues that the superior court erred under the Indian Child Welfare Act in finding beyond a reasonable doubt that Larry's continued custody likely would result in serious emotional or physical damage to Jenna. Because we conclude that the superior court did not err, we affirm.

II. FACTS AND PROCEEDINGS
Jenna W. was born on November 11, 1998 to Larry W. and Francine A. Francine was affiliated with the native village of Kaltag, making Jenna an Indian child per the Indian Child Welfare Act (ICWA).[2]
Francine had a longstanding problem with alcohol abuse and, according to Larry, tended to become verbally aggressive towards him when she drank. Larry worked with the Office of Children's Services (OCS) to obtain a protective order against Francine and, in April 2003, she moved out of the apartment in which Larry and Jenna resided. Larry then became Jenna's sole caretaker.
In February 2005, while Larry and Jenna were living in a four-unit apartment complex that he managed for the owner, OCS received a report from a building tenant that Larry had sexually abused Jenna. The state petitioned for temporary custody under both the ICWA and children in need of aid (CINA) statutes.[3] Jenna was taken into *158 emergency custody and placed with an unrelated native family.
An emergency custody hearing was held in February and March 2005. The tenant who had reported sexual abuse and an OCS specialist who had investigated the allegations both testified. The specialist testified that, during her investigation of the potential sexual abuse, Jenna had said that Larry sometimes left her alone at night and became "mean" when he drank. The specialist also testified that Larry had admitted that he sometimes locked Jenna in the bathroom as a discipline technique.
Larry testified at the emergency custody hearing and admitted to leaving Jenna alone for fifteen to twenty minutes at a time while he went to the grocery store. He testified that he was aware Jenna was "a little bit concerned" about being left alone but that he was trying to get her used to being able to "take care of herself." He also stated that he felt the social workers were "overexaggerating" the problem of leaving Jenna unattended.
At the end of the hearing, the superior court concluded that there was a substantial risk Jenna would suffer sexual abuse and substantial physical harm for want of supervision if left in Larry's custody. The court concluded that it was in Jenna's best interests to remain in the temporary custody of the state.
Larry was given a case plan that required him to get a sex offender evaluation, attend parenting classes, obtain a substance abuse evaluation, and attend visitation with Jenna. Larry was reportedly "diligent in participating in treatment services requested." But OCS remarked that he was not progressing in his treatment and seemed "unable to develop and demonstrate appropriate new skills, understandings and abilities to ameliorate the problems that affect the health and safety of his daughter."
In August 2005 Larry underwent a mental assessment in which a licensed clinical social worker determined that Larry "presents with a complexity of mental health issues." The evaluator reported that his "odd thinking and speech, suspicious and paranoid ideation, and excessive social anxiety indicate Schizotypal Personality Traits." The social worker later testified at the termination trial that Larry's personality traits caused him to be suspicious of outsiders and misinterpret social cues.
In May 2006 OCS petitioned to terminate Francine and Larry's parental rights. OCS filed an amended termination petition in September 2006, asserting abandonment, inadequate supervision, neglect, substance abuse, and mental illness. OCS no longer alleged sexual abuse.
A five-day termination trial was held in February 2007. An OCS social worker testified that Jenna had spent eight days in Hawaii state custody after a social service agency received a report indicating that she and Larry were sleeping on the streets. Larry testified that having Jenna in state custody came in "real handy" as it allowed him to install a roof over his makeshift shelter, which he characterized as a "hut" or "hacienda." The licensed clinical social worker who had evaluated Larry in August 2005 testified that Larry told her he would leave Jenna home alone in Hawaii, presumably at their camp, for a few hours at a time and that he was proud of Jenna's ability to "take care of herself when he had to be gone." Larry testified that Jenna was around five years old at the time.
A certified chemical dependency counselor also testified during the termination trial about the services OCS had been providing Jenna. Given her mother's history of alcohol abuse and the learning difficulties Jenna was beginning to exhibit, the counselor testified there was suspicion that Jenna might be afflicted with fetal alcohol syndrome (FAS). A physician had examined Jenna for an initial evaluation but had not yet reached a diagnosis of her condition at that time.
At the conclusion of the trial, the court terminated Francine's parental rights but declined to terminate Larry's. The court concluded that, even though it was in Jenna's best interests that Larry's parental rights be terminated, it could not find evidence beyond a reasonable doubt that Jenna would suffer *159 serious emotional and physical harm if she were placed in Larry's care.[4]
The court ordered Larry to undergo a mental health assessment, and Larry received a psychological evaluation in April 2007. The psychologist concluded that, although Larry was not suffering from a mental disorder, he did exhibit "personality traits" similar to the schizotypal or schizoid traits first observed during Larry's 2005 mental health assessment. The psychologist noted that these traits were "characterized by the preference to maintain interpersonal distance and behavior that has little regard for social convention." He stated that the prognosis of a good therapeutic outcome was "guarded."
In September 2007 Jenna's FAS evaluation was completed. The doctor who examined Jenna diagnosed her with alcohol-exposed neurobehavioral disorder, attention deficit hyperactivity disorder (ADHD), and a moderate mixed language disorder.
In March 2008 the superior court permitted the parties to produce more evidence relevant to whether Larry's parental rights should be terminated. OCS elicited new testimony concerning the impact of Jenna's newly diagnosed condition on her needs. Four experts testified that Jenna required stability, consistency, structure, and attention, the absence of which might make her more susceptible to frustration, depression, behavioral problems, or even delinquency.
Based on the expert testimony, the superior court found that Jenna had special needs that were "in direct conflict with [Larry's] personality." The court also found that "[r]outine, attention, order, stability, and predictability are all foreign to [Larry's] life" and that, if returned to Larry's care, Jenna would "certainly suffer emotionally" and likely physically, as well. The court then terminated Larry's parental rights as to Jenna.
Larry appeals.

III. DISCUSSION

A. Standard of Review
In cases concerning the termination of parental rights, we will affirm the superior court's factual findings so long as they are not clearly erroneous.[5] A finding is clearly erroneous only if a review of the entire record leaves us "with a definite and firm conviction that the superior court made a mistake."[6] A lower court's decision will not be reversed if the error was harmless.[7]
In reviewing the superior court's decision, we look for evidence in the record that supports the superior court's findings and conclusions.[8] It is the role of the superior court to judge the credibility of any witnesses and to weigh conflicting evidence.[9] Conflicting evidence is generally insufficient to overturn a superior court's decision to terminate parental rights, and we will not reweigh evidence when the record provides clear support for the superior court's ruling.[10]
A superior court's finding that continued custody of the child by the parent would result in serious damage is reviewed for clear error.[11] Whether the superior court's factual findings comport with the requirements *160 of the CINA and ICWA statutes is a question of law that we review de novo.[12]

B. The Superior Court's Finding that Jenna Has Special Needs
Larry argues that the superior court's finding that Jenna had special needs was clearly erroneous. He contends that the superior court mistakenly relied on testimony concerning FAS children, improperly equated Jenna's neurobehavioral disorder with FAS, and consequently misunderstood the severity of Jenna's condition. Larry also argues that the superior court failed to consider that Jenna possessed many strengths that "compensated for her difficulties." He specifically argues that Jenna was happy, motivated to do well, and that her average IQ and intelligence made up for the fact that she suffered from ADHD, moderate language disorder, and a "moderately low" adaptive behavior score.
OCS argues in response that any "minor references" in the superior court's order suggesting that Jenna is afflicted with FAS are not controlling factual findings. OCS asserts that the superior court did not err with respect to the critical factual findings that: (1) Jenna is a special needs child, and (2) Larry is unwilling and unable to provide Jenna with the structure and predictability she needs. In light of extensive testimony that Jenna requires more supervision and structure, OCS asserts that the superior court did not err in finding that, despite her strengths, Jenna had significant learning and behavioral problems requiring care that Larry was unable to provide.
The superior court seemingly based its decision to terminate Larry's parental rights in part on Larry's inability to meet the challenges created by the "overlay of FAS with attention deficit disorder." But, as Larry correctly argues, Jenna was never formally diagnosed with FAS. The doctor who evaluated Jenna in January 2007 expressly noted that "some, but not all, of the characteristic physical findings seen in patients with FAS were present." He diagnosed her at that time with alcohol-exposed neurobehavioral disorder as well as ADHD and moderate mixed-language disorder. Although the doctor testified at trial as an expert on fetal alcohol spectrum disorder (FASD), he never testified that Jenna had been clinically diagnosed with FAS.
Nevertheless, the superior court's apparent misdescription of Jenna's condition as FAS is not reversible error. The court correctly characterized the medical diagnosis in concluding that Jenna had some type of brain impairment which a caregiver should take into account when considering her "education, social expectations, and her general health." The court also noted that all of the experts who testified in March 2008 agreed that Jenna had special needs that were best met with fixed routines, stability, a clutter-free home environment, and a self-disciplined and patient guardian who was willing to undertake the tedious chores required for Jenna's development. Each of these experts had either conducted a personal examination of Jenna or evaluated her file. The court certainly found persuasive these expert assessments that Jenna had more particularized needs than the average child. Any failure to precisely describe the affliction that precipitated those needs was therefore harmless.
Similarly unpersuasive is Larry's argument that the superior court failed to consider that Jenna possessed many strengths that "compensated for her difficulties." The superior court implicitly recognized Jenna's strengths but discounted their ability to offset her deficits, when it expressly noted that the expert witnesses unanimously concluded that Jenna was a "special needs child, with positive strengths, but deficits which were critical for [Jenna's] development."
This finding was well-supported by the testimony of two experts who indicated that IQ can be deceptive when it comes to determining whether a child has special needs. One of these experts testified that many children who have been exposed to alcohol, *161 even those who are severely affected, can have above-average IQs and still have some form of disability.
Given this evidence, we hold that the superior court did not err by finding that, despite her strengths, Jenna had special needs that required particularized attention.

C. The Superior Court's Finding Concerning the Likelihood of Future Damage
Larry argues that the superior court erred in finding under subsection 1912(f) of ICWA that returning Jenna to his care would cause her serious emotional or physical damage. Larry contends that OCS had to prove beyond a reasonable doubt that (1) his conduct was likely to harm Jenna, and (2) it was unlikely his conduct would change. Larry asserts that the superior court incorrectly focused on his personality, not his conduct, in determining the likelihood of harm.
OCS argues in response that the superior court was correct to consider Larry's personality traits given the impact those traits had on his conduct. OCS contends that Larry's unresolved mental health issues, his lack of stability and structure, and his denial that Jenna has special treatment needs provided evidence beyond a reasonable doubt that giving custody to Larry would likely result in serious emotional or physical damage to Jenna.
In cases involving Indian children, subsection 1912(f) of ICWA requires courts to find, before terminating parental rights, that continued custody with the parent is likely to result in serious emotional or physical damage. Subsection 1912(f) provides:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.[[13]]
We explained in L.G. v. State that establishing the likelihood of damage requires both proof that the parent's conduct is likely to harm the child, and proof that it is unlikely that the parent will change his or her conduct.[14] Those two elements may be "proved through the testimony of a single expert witness, by aggregating the testimony of expert witnesses, or by aggregating the testimony of expert and lay witnesses."[15]L.G. concerned two children, one of whom was developmentally delayed, who had been taken into foster care on more than one occasion during their mother's repeated drug and alcohol relapses.[16] Without referring either to the mother's potential for improvement or an explicit finding by the superior court on the issue, we held that the superior court did not err in concluding that the children were at a substantial risk of suffering further mental injury in their mother's care.[17]
We similarly hold here that the court satisfied both prongs of L.G. despite the absence of an explicit finding on Larry's poor potential for change. The court made the predictive finding required by L.G. when it implicitly concluded that Larry would not be able to provide for Jenna's special needs. In making this determination, the court relied on four expert assessments indicating that, in light of her neurobehavioral and attention deficits, Jenna needed to be placed in an ordered and structured home environment with a patient and self-disciplined caregiver.
Ample evidence supports the superior court's implicit finding that Larry was unlikely to alter the conduct that put Jenna at risk of harm. The court noted that Larry was "extremely reluctant to address the defects in his parenting" and had not eliminated the dangers posed to Jenna by alcohol abuse and exposure to domestic violence. *162 Larry refused to participate in random urinalysis testing after the petition to revoke parental rights was filed and  as he admits  failed to follow what he termed aftercare "recommendations" for alcohol treatment. He also permitted Francine to spend the night despite her problems with domestic violence and substance abuse.
Larry's claim that the court focused too much on his personality when it should have been evaluating his conduct is unpersuasive. The court expressly found that Larry's conduct, including leaving Jenna unsupervised and locking her up alone for a lengthy period as punishment, amounted to "monumental blunders in parenting." It is also significant that, when they were living in the encampment in Hawaii, Larry left Jenna by herself for hours at a time. We likewise note that, when Jenna was taken into Hawaii state custody, Larry allowed her to remain there for eight days and intentionally delayed retaking custody so he could install a roof on his makeshift shelter.
Larry's argument also incorrectly assumes that there is an irreconcilable dichotomy between personality and conduct. Although the superior court appears to have taken Larry's "personality" into account in evaluating his ability to parent Jenna, it is appropriate to consider a parent's mental or psychological limitations when they are associated with conduct that could be harmful to the child.[18]
The court was justified in considering whether Larry's "schizoid" personality trait might affect his lifestyle, behavior, and conduct in such a way as to limit his ability to provide for Jenna's needs. We conclude that the record adequately supports the court's apparent finding that Larry's personality could be harmful to Jenna. The licensed clinical social worker who performed a mental health assessment of Larry indicated in her written report that his schizotypal personality trait "certainly impacts the way that he parents his daughter." She testified at the first termination hearing that it likely caused Larry to misinterpret Jenna's maturity level and would potentially make it difficult for Larry to assist Jenna with her own interpersonal and academic difficulties.
The psychologist who examined Larry in 2007 also recognized personality traits similar to those first observed in 2005 and noted in his report that these traits were "characterized by the preference to maintain interpersonal distance and behavior that has little regard for social convention." He gave no indication that Larry's mental health issues would be resolved and instead noted that the prognosis of a good therapeutic outcome was "guarded." Therefore, the court's comments about personality help explain why it implicitly found that Larry's conduct, which had posed a danger to Jenna in the past, was unlikely to change.
Given the expert assessments of Jenna's parenting needs, the lack of structure and stability in Larry's life, and his resistance to OCS's remedial efforts, there was sufficient evidence, satisfying the reasonable doubt standard, on which to base a determination that Jenna likely would suffer serious emotional, if not physical, damage if she were returned to Larry's custody. We accordingly hold that the superior court's finding as to the likelihood of serious future damage was not clearly erroneous.

IV. CONCLUSION
We therefore AFFIRM the decision terminating Larry's parental rights.
NOTES
[*] Entered pursuant to Appellate Rule 214.
[1] Pseudonyms have been used throughout this opinion to protect the identity of the parties.
[2] 25 U.S.C. § 1903(4) (2006).
[3] AS 47.10.005-.142.
[4] Although Francine's parental rights had been terminated, ICWA continued to apply even though Larry was non-Native. See Matter of Adoption of T.N.F., 781 P.2d 973, 978 (Alaska 1989).
[5] J.S. v. State, 50 P.3d 388, 391 (Alaska 2002) (quoting A.A. v. State, Dep't of Family & Youth Servs., 982 P.2d 256, 259 (Alaska 1999)).
[6] M.W. v. State, Dep't of Health & Soc. Servs., 20 P.3d 1141, 1143 (Alaska 2001).
[7] See Vachon v. Pugliese, 931 P.2d 371, 376 (Alaska 1996).
[8] See R.G. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 43 P.3d 145, 149 (Alaska 2002).
[9] Martin v. Coastal Vills. Region Fund, 156 P.3d 1121, 1129 (Alaska 2007) (citing Silvan v. Alcina, 105 P.3d 117, 122 (Alaska 2005)).
[10] Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 175 P.3d 1263, 1267 (Alaska 2008) (affirming superior court's order terminating parental rights of Indian parent who challenged findings regarding failure to remedy and the sufficiency of the state's efforts to prevent family breakup).
[11] J.S. v. State, 50 P.3d 388, 395 (Alaska 2002).
[12] Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 102 P.3d 932, 935 (Alaska 2004); State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. v. M.L.L., 61 P.3d 438, 442 (Alaska 2002).
[13] 25 U.S.C. § 1912(f) (2006).
[14] L.G. v. State, Dep't of Health & Soc. Servs., 14 P.3d 946, 950 (Alaska 2000) (citing In re Parental Rights of T.O., 759 P.2d 1308, 1310 (Alaska 1988)).
[15] Id. at 950.
[16] Id. at 948-49.
[17] Id. at 951.
[18] See A.H. v. State, Dep't of Health & Soc. Servs., 10 P.3d 1156, 1162 (Alaska 2000) (holding that "while mental illness alone cannot form the basis of a termination order, when the record links the parent's continuing mental illness with his past instances of extreme neglect, there may be a basis for finding that improper parental conduct is likely to continue" (emphasis in original) (internal quotations omitted)).