NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| PAUL M., ) | |
| ) | Supreme Court No. S-14850 |
| Appellant, ) | |
| ) | Superior Court No. 4FA-10-00026 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT ) | AND JUDGMENT[*] |
| OF HEALTH & SOCIAL SERVICES, ) | |
| OFFICE OF CHILDREN'S SERVICES, ) | No. 1454 – March 20, 2013 |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

Appearances: Hanley Robinson, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Megan R. Webb, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

---

[*]    Entered under Alaska Appellate Rule 214.

## I.    INTRODUCTION

Shortly after Leo G. came into the custody of the State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS), his father, Paul M., stopped communicating with OCS and left Alaska without providing a forwarding address.[1] After being out of touch for over a year, Paul contacted OCS when he learned that a petition to terminate his parental rights had been filed. Following a trial, the superior court terminated Paul's parental rights on the basis that he had abandoned Leo. Paul appeals the termination order, arguing that the superior court erred in finding (1) that he had abandoned Leo, and (2) that OCS made reasonable efforts to provide him with reunification services. Because the superior court's findings are supported by adequate evidence, we affirm its order terminating Paul's parental rights.

## II.    FACTS AND PROCEEDINGS

Leo came into OCS's custody in February 2010, following a report that his father, Paul, had physically abused him. Leo was seven years old at the time. Sean O'Neil, Leo's therapist, reported that Leo said Paul hit him because he had gotten into trouble at school. Leo's body was covered in bruises, marks, and scars, and O'Neil reported that Leo was suffering from hypervigilance, night terrors, and intermittent explosive disorder.[2]

Paul was arrested and charged with assault in the third degree. Leo was initially placed with his stepmother, Lily M., but when Paul was released on bail and Lily

---

[1]    Pseudonyms are used for all family members.

[2]    Following his removal from Paul's custody, Leo made great strides. According to O'Neil, by the time of the termination trial in February 2012 Leo had progressed from being "very fearful, scared, angry, sad, [and] reactive" to a "normal healthy child" who required continuing therapy only to address the ongoing uncertainties in his life.

was appointed his third-party custodian, Leo was moved to a foster home.

While Paul's criminal charges were pending, he was prohibited by a court order from having contact with Leo. Investigating social worker Wendy Williams told Paul that she was willing to advocate to have the order modified so that OCS could begin supervised visits between Paul and Leo, but Paul did not request a hearing for that purpose. Paul participated telephonically in two Team Decision Making meetings to determine Leo's placement, but otherwise generally resisted OCS's efforts to communicate with him and involve him in the case; he did not appear for meetings Williams scheduled to discuss the case and develop a case plan. After being released from custody on bail, Paul did not answer calls from Williams and did not return her messages. For a time Williams passed messages to Paul through Lily, but then Lily, too, stopped accepting Williams's calls.

During a telephone conversation in March 2010, Paul told Williams that Lily had moved to Maryland with their two children and that he intended to join her there. But two weeks later Williams saw Lily at the hospital where Lily was employed. Toward the end of Williams's involvement with the case in April 2010, OCS confirmed that Paul and Lily had moved from their home without leaving a forwarding address. Williams continued, unsuccessfully, trying to reach Paul by telephone and by visiting his last known address.

Based on her limited contacts with Paul, Williams prepared a draft case plan designed to reunite Paul with Leo. The plan was intended to address the physical abuse and mental injuries Paul had inflicted on Leo and to help Paul develop appropriate parenting skills. It called for Paul to participate in a behavioral evaluation at the LEAP alternative-to-violence program, follow the evaluation's recommendations and successfully complete treatment, participate in a mutually agreed-upon parenting skills program, and engage in individual counseling with Leo's therapist, O'Neil.

Williams gave Paul contact information for O'Neil and also contacted O'Neil herself. Social worker Nicole Havrilek, who took the case over from Williams in late April 2010, testified that counseling with O'Neil would have been a "huge" part of Paul's reunification process. Paul met with O'Neil for a single session. O'Neil testified that he had blocked an entire morning for Paul's session, but Paul chose to leave after 45 minutes. O'Neil offered to help Paul enroll in parenting classes at Fairbanks Counseling and Adoption, where O'Neil practiced, intending to continue Paul's sessions with a long-range goal of bringing Paul and Leo together in sessions. But after the initial session Paul never returned.

In May 2010 Paul pleaded guilty to a reduced charge of attempted assault in the third degree. He was sentenced to 360 days with 342 days suspended. His sentence required him to complete an evaluation at LEAP and follow its recommendations, attend parenting classes, and comply with his OCS case plan. In addition, he was prohibited from having contact with Leo without OCS's permission.

Paul did not contact Havrilek after she took over the case and she was unsuccessful in contacting him, despite mailing numerous letters to and visiting his last known address, placing calls to a telephone number Lily had given her, searching state motor vehicle and public assistance databases, and contacting Paul's CINA attorney, his relatives in Maryland, and members of his church. Havrilek's efforts were fruitless because, unknown to OCS, by June 2010 Paul had left Alaska for Colorado.

In August 2010 Paul's attorney sent Williams an email informing her that Paul "would like to get visitation and parenting classes started." Williams responded by email, informing the attorney that she was no longer assigned to the case, but that the responsible social worker was now Havrilek.

Shortly thereafter, unaware of Paul's whereabouts and having received information indicating that Paul might be planning to kidnap Leo, OCS obtained a

restraining order to prevent Paul from having contact with Leo. State troopers were employed to serve the order on Paul but were unable to locate him.

Between June and November 2010 Paul completed a 24-week domestic violence and anger management group treatment program, and in February 2011 he attended a one-day parenting class, both in Colorado. Paul did not inform OCS, and Havrilek was unaware of his participation in these services. Havrilek testified that if Paul had contacted OCS, the agency could have referred him to programs, helped pay for them, and provided the programs appropriate collateral information.

On August 29, 2011, OCS petitioned to terminate Paul's parental rights to Leo. The petition alleged that Paul had abandoned Leo by making only minimal efforts to support or communicate with him for well over a year, by not visiting Leo during that time, and by failing to participate in a reunification plan. The following month Paul resurfaced, sending Havrilek an email indicating that he was aware of the termination petition. Paul stated that he had not engaged in reunification services because he had been under the impression that Leo was living with Leo's mother in Georgia, but he now understood that this was not the case.[3]

In February 2012 the superior court held a trial on OCS's petition to terminate Paul's parental rights. The court terminated Paul's rights, finding that he had willfully and deliberately abandoned Leo, avoided all contact with the child, and went to great lengths to avoid contact with OCS. In contrast, the court found that OCS diligently searched for Paul and made numerous other efforts to support the family, including: holding meetings for case planning; identifying family support services to

---

[3]     Leo was never placed with his mother. Early in the case OCS requested an evaluation under the Interstate Compact for the Placement of Children to initiate placing Leo with his mother, but the evaluation ruled her out. Leo's mother's parental rights are not at issue in this appeal.

reduce the risk of future child abuse; providing Leo medical, psychological, and counseling services; arranging for Paul to participate in counseling; and attempting to maintain Leo's ties to his stepmother and stepsiblings.

Paul appeals the superior court's decision, challenging the findings that he abandoned Leo and that OCS made reasonable efforts to provide family support services.

## III. STANDARD OF REVIEW

The superior court's determination that OCS met its evidentiary burden in showing that the child is a child in need of aid is a factual finding.[4] Whether OCS made reasonable efforts to provide the family with support services to promote reunification is a mixed question of fact and law.[5] We will affirm the superior court's factual findings that are not clearly erroneous.[6] A finding is clearly erroneous when we are left with a definite and firm conviction based on the entire record that the superior court made a mistake.[7] Whether the superior court's factual findings satisfy the CINA statutes and rules is a question of law that we review de novo.[8]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Finding Paul Abandoned Leo.

Alaska Statute 47.10.011(1) provides in relevant part that a child may be found to be a child in need of aid if "a parent or guardian has abandoned the child as

---

[4]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

[5]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[6]     *J.S. v. State*, 50 P.3d 388, 391 (Alaska 2002).

[7]     *Id*.

[8]     *Id*.

described in AS 47.10.013, and the other parent is absent."[9] Alaska Statute 47.10.013(a) defines abandonment as "a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult." The subsection also describes specific conditions constituting abandonment, including when a parent, without justifiable cause, has "made only minimal efforts to support and communicate with the child . . . failed for a period of at least six months to maintain regular visitation with the child . . . [or] failed to participate in a suitable plan or program designed to reunite the parent . . . with the child." We have articulated a two-part test for reviewing a finding of abandonment: "(1) there must be parental conduct evidencing a 'willful disregard' for parental obligations, leading to (2) the destruction of the parent-child relationship."[10] To avoid a finding that obligations have been willfully disregarded, the parent must demonstrate "a continuing interest in the child and a genuine effort to maintain communication and association with the child."[11] We apply an objective test to determine if actions "demonstrate a willful disregard of parental responsibility."[12]

---

[9]     OCS transported Leo's mother from her home in Georgia to Fairbanks for two visits over the course of the case and she spoke with Leo by telephone, but in the time that Leo has been in OCS's custody his mother has never acted as his parent, and thus has been "absent" for purposes of the statute.

[10]     *Rick P. v. State, OCS*, 109 P.3d 950, 957 (Alaska 2005) (citing *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 67 P.3d 648, 651–52 (Alaska 2003)).

[11]     *E.J.S. v. State, Dep't of Health & Soc. Servs.*, 754 P.2d 749, 751 (Alaska 1988) (quoting *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)) (internal quotation marks and alteration omitted).

[12]     *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335-36 (Alaska 2011) (quoting *Jeff A.C., Jr. v. State*, 117 P.3d 697, 704 (continued...)

Paul disputes the superior court's finding that he abandoned Leo by failing to maintain contact with OCS and, through OCS, with Leo. He contends that he had no contact with Leo after February 2010 because OCS prevented him from having contact. He alleges that "OCS forced Paul out of Leo's case and then ignored his efforts at remedying the conduct that brought Leo into custody." Paul's arguments are unpersuasive. As the superior court found, Paul voluntarily left Alaska and intentionally deprived OCS of any ability to communicate with him. With a single minor exception,[13] Paul made no attempt to contact OCS or to see his son for well more than a year, even though he knew that OCS was working to help reunite him with Leo.

In arguing that OCS prevented him from visiting Leo, Paul relies heavily on the fact that OCS obtained a restraining order against him. But OCS's action, which came after Paul had surreptitiously left the state and deliberately cut off communications, came in response to OCS's suspicion that Paul may have been intending to kidnap Leo. If OCS had known that Paul was not even in Alaska at the time, it would have had no cause to seek a restraining order. Moreover, the record contains no indication that Paul was aware of the restraining order.

Paul also asserts that even if he had remained involved in the case, OCS would not have allowed him to visit Leo. This argument is belied by the record — social worker Williams offered to help Paul have the no-contact order in his criminal case modified to allow supervised visits with Leo even while the criminal case was pending,

[12](...continued) (Alaska 2005)) (internal quotation marks omitted).

[13] Paul's attorney's email to social worker Williams in August 2010 can hardly be counted as a realistic attempt by Paul to engage in a case plan or communicate with OCS or with Leo. Paul was living in Colorado at the time, and when informed that social worker Havrilek, not Williams, was the appropriate person to contact with his request, Paul's attorney took no further action.

but Paul did not follow up on her offer.

Finally, Paul argues that his lack of contact was justified because he believed that instead of being in foster care in Alaska, Leo had been placed by OCS with Leo's mother in Georgia. This argument is without merit; Paul's failure for well over a year to make any attempt to maintain or rekindle a relationship with his child — regardless of whom Paul thought the child was then living with — clearly satisfied the statutory definition of abandonment.[14]

Paul also disputes the superior court's finding that he abandoned Leo by failing to engage in a plan designed to reunite him with his son. Paul claims that he could not engage in a case plan because OCS did not provide him with one. In the alternative he argues that services he completed in Colorado satisfied his case plan requirements. These arguments, too, are unpersuasive. Paul did not receive a formal case plan because after refusing to participate meaningfully in developing a plan, he severed all contact with OCS and voluntarily left Alaska before OCS could finalize his plan. He argues that OCS shut him out of Leo's life by failing to offer him services early in the case, but he fails to acknowledge that he refused services OCS offered, including scheduling meetings to develop a case plan, offering to assist in modifying the no-contact order in Paul's criminal case so that he could have supervised visits with Leo, and referring Paul for counseling.

Paul's argument that classes he completed in Colorado fulfilled elements of his plan is unconvincing for three reasons. First, Paul did not inform OCS of his

---

[14] *See* AS 47.10.013 (a court may find that a parent abandoned a child where the parent "has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision").

participation in those services, and OCS received no documentation regarding them.[15] Second, OCS did not have the opportunity to provide appropriate collateral information to the programs, which is essential for a treatment provider to possess to address a client's particular issues. Third, even if the Colorado domestic violence and anger management program were sufficient to satisfy the LEAP element of Paul's case plan, he was also required to complete a "mutually agreed upon" parenting skills program and to participate in individual counseling with O'Neil, neither of which he did. Social worker Havrilek testified that the parenting class Paul attended did not satisfy his case plan, which required "much longer than an eight-hour class." O'Neil testified that he was willing to provide ongoing services but that Paul did not accept those services.

In short, Paul knew that his own conduct resulted in OCS having taken custody of Leo and he knew that OCS's social workers stood ready to work to help him reunite with his son. Yet he avoided all contact with OCS and moved to Colorado, where he remained hidden from OCS, and from Leo, for well over a year.

We recently affirmed a superior court's termination of a father's parental rights in a case with similar facts. In *Sherman B. v. State, Department of Health & Social Services, Office of Children's Services*, the father initially refused to work with OCS to develop a case plan, visited his child only intermittently, and left Alaska for months at a time without informing OCS of his plans, but complied with a portion of his case plan

---

[15] As social worker Havrilek testified:

[I]f [Paul] had been in contact, if he had signed releases, if he had let us know he was engaged in any of these services we could have worked with him and would have absolutely been willing to work with him. I can't work with things that I don't know anything about.

by completing parenting classes.[16]  In affirming the superior court's termination of the father's parental rights, we held that a parent's "refusal to provide even basic information and communicate with OCS is evidence of his conscious disregard of his parental responsibilities."[17]  We held that to refute such evidence, a parent must demonstrate a continuing interest and make "*a genuine effort* to maintain communication and association."[18]  We  noted that "[e]ven if he did not agree with or trust OCS, the reality is that communication with OCS and compliance with the case plan's reasonable requirements were necessary to build a relationship with his daughter."[19]  Finally, we observed that "token efforts" at communication are insufficient to establish (or, as in the present case, to maintain) a parent-child relationship.[20]

The facts of the present case are not distinguishable in any meaningful way from those of *Sherman B.*  If anything, Paul's conduct provides a more compelling case for abandonment than did the conduct in *Sherman B.*  Paul's actions clearly demonstrated a willful disregard for his parental obligations, resulting in the destruction of the parent-child relationship.  O'Neil testified that by the time of the trial Leo had had no relationship with Paul for nearly two years, and he testified that by that time any contact between the two, even if strictly supervised, would cause Leo psychological detriment.

---

[16]     290 P.3d 421, 424-26 (Alaska 2012).

[17]     *Id.* at 430.

[18]     *Id.* at 429 (emphasis in original) (quoting *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 336 (Alaska 2011)).

[19]     *Id.*

[20]     *Id.* at 430 (quoting *Sean B.*, 251 P.3d at 336).  Unlike the token efforts made by the parent in *Sherman B.*, Paul made *no* efforts — not even token efforts  — to communicate with Leo for well over a year before OCS moved to terminate his rights, and nearly two years by the time of trial.

We therefore affirm the superior court's finding, by clear and convincing evidence, that Paul abandoned Leo.

B.    **The Superior Court Did Not Err In Finding OCS Made Reasonable Efforts To Reunify Paul With Leo.**

Before terminating parental rights under AS 47.10.088, the superior court must find by clear and convincing evidence that OCS made timely and reasonable efforts to provide services designed to reunite the family.[21]  In determining what efforts are appropriate, OCS may take into account the parent's level of interest as well as the parent's actions.[22]  In *Jeff A.C., Jr. v. State*, we affirmed the superior court's finding that OCS made reasonable efforts to reunify a father with his child over the father's challenge that OCS did not make reasonable efforts to locate him after his child was born, and that once he was notified of his child's existence, rather than putting forth reasonable efforts to reunify, OCS's actions demonstrated an intent to "thwart" the father's right to parent his daughter.[23]  We held that where a parent does not remotely commit to the job of parenting a child, "the law — as well as common sense — does not dictate the state force him, against his will, into accepting the job."[24]  The present case presents such a situation.  As discussed above, Paul demonstrated virtually no interest in parenting Leo from February 2010 through August 2011, and his actions were designed to frustrate OCS's ability to provide reunification services.

Paul's arguments that OCS did not make reasonable efforts mirror his arguments in regard to abandonment.  He asserts that OCS discouraged him from seeing

---

[21]    *Sherman B.*, 290 P.3d at 432.

[22]    *Jeff A.C., Jr. v. State*, 117 P.3d 697, 707 (Alaska 2005).

[23]    *Id.* at 705, 707.

[24]    *Id.* at 707.

Leo, denied him visitation early in the case, then "indefinitely discontinued" visitation, and sent him "the unspoken message that reunification was not an option." As previously discussed, these allegations are without support in the record. Indeed, the record shows that early in the case OCS attempted to provide Paul with case planning services, supervised visitation, and counseling, but Paul refused to cooperate with OCS or participate in the services offered to him.

OCS cannot provide services to a parent who deliberately becomes unavailable. In this case, OCS's early attempts to provide Paul services, followed by its attempts to locate him, constituted sufficient efforts to provide reunification services. We therefore affirm the superior court's finding, by clear and convincing evidence, that OCS made reasonable efforts to provide reunification services.

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's order terminating Paul's parental rights to Leo.