**WILSON W., Appellant,**

v.

**STATE of Alaska, Office of Children's Services, Appellee.**

No. S–12828.

Supreme Court of Alaska.

June 13, 2008.

---

Doug Moody, Assistant Public Defender and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, and WINFREE, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

A father appeals the superior court's finding that his four children are children in need of aid. In 2006 the Office of Children's Services (OCS) removed the children after investigating an incident of domestic violence and after the father subsequently threatened OCS social workers. The parents were unwilling to cooperate with OCS following the removal; OCS thus formed a case plan without their input. The superior court found that the children are in need of aid and that OCS made active efforts to reunite the family as required by the Indian Child Welfare Act (ICWA). Because we conclude that the state made active efforts despite the father's repeated refusal to cooperate and his threats of violence against OCS caseworkers, we affirm the superior court's decision that these children are children in need of aid.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Background

Wilson and Sarah have four children together: Wes (born in 1992), Marco (born in 1996), Dustin (born in 2000), and Skyla (born in 2002).[1] The children are Indian children under ICWA. The family lives in Trapper Creek.

According to neighbors, members of the community, police officers, and his children, Wilson is an extremely violent man who has abused Sarah throughout their relationship. Wilson has had several convictions for assaulting Sarah. From 1995 to 2006 OCS investigated eleven alleged incidents of domestic violence between Wilson and Sarah. Six of these allegations were substantiated.

Allegations of Wilson's abuse extend to abuse of the children as well. After Wes once told a state trooper "that he had been in pain from being swatted, hit in the head ... by [Wilson]," the state trooper filed charges against Wilson for assault in the fourth degree. Two years later, during an OCS interview with the three boys, they reported that Wilson abused all four children. He hit Wes and Marco with a closed fist; he hit Dustin and Skyla with an open hand; and he disciplined the children using a belt, which left bruises.

From 1998 until OCS's ultimate removal of the four children in 2006, multiple reports were filed with OCS. OCS first became involved with the family in 1998 after Wilson was convicted for assaulting Sarah. Sarah briefly followed through with a referral to Family Support Services, but Wilson refused to work with Family Support Services. OCS described him as "resistant to the idea." In 2002 OCS again offered services to Wilson after Sarah was hospitalized in a poisoning incident but he again refused. In 2003 a child development associate for the children's school district filed a report with OCS after Sarah admitted that Wilson had been abusing her. Later in 2003 a police officer filed a report with OCS due to Sarah's visible injuries and Wes's statements that Wilson had also abused him. In 2005 Dustin's school filed a report of harm with OCS concerning Dustin. The investigation did not proceed because Wilson and Sarah refused to allow OCS onto their property.

#### 2. Removal

On October 25, 2006, Sarah called a domestic violence crisis line after an argument with Wilson. OCS received a report of harm of domestic violence in the household and undertook an investigation. This report "indicated that both [Sarah] and [Wilson] were physically assaulting each other, that [Wil-

---

1. In order to protect the privacy of the parties, we use pseudonyms.

son] was [verbally abusing Sarah] and threatening to hit her every time she started up again. According to the report both [Sarah] and [Wilson] expressed frustration at lack of access to medical and mental health resources due to their remote location."

Two days later, on October 27, OCS sent Child Services Specialist Paula Jones and a social worker to interview Wes at his school. After expressing that he was "fearful of talking because he had talked with someone before and his dad had gone to jail for that," Wes confided to Jones that "[Wilson] had become angry because [Sarah] couldn't find [Marco's] coat for school that morning, and ... [Wilson] had punched [Sarah] and [Sarah] had a black eye." Wes also described his father's abuse against him and his siblings. Jones described Wes as being "afraid for his mom" and "afraid of his dad." Jones then interviewed Marco and Dustin at their elementary school.

Following her interviews with the three boys, Jones "immediately went to the house.... [Wilson and Sarah] were not at home. [Jones] left a card on the door .... [asking] for a return call." Upon finding Jones's business card, Wilson "immediately called [Jones's] office ... and spoke with [her] supervisor, Terry Bryers, and stated that if a social worker stepped foot on the property, that they wouldn't leave the property alive and not to send someone back." There were also allegations that Wilson threatened that "if a social worker goes on his property, that he was going to take them down, duct-tape them, [and] take them out to the woods where they would never be found." Wilson then contacted the Talkeetna trooper post and relayed a similar threatening message regarding actions he would take if a social worker came onto his property and warned that the children would only be removed over his "cold, dead body." As a result of these threats the state troopers removed the four children on October 28 without OCS present.

The state troopers brought the four children to Jones and OCS social worker Jalean Mallett. Mallett recalls that at the time the children were "dirty[,] ... their clothes had holes in them, and ... they smelled pretty

bad." Skyla "smelled really bad of urine." Skyla's hair was "stuck to the back of her hair [sic] and kind of knotted." Marco "had like a caked something on the back of his head ... [a] kind of brownish, yellowish substance, and it covered pretty much most the back of his head." All four children required dental work. Skyla ultimately had to undergo dental surgery because fourteen of her nineteen teeth suffered from bottle rot.

Jones and Mallett rode with all four children on their way to the children's respective foster homes. Wes and Marco began to fight during the ride after Wes acknowledged the domestic violence in the household. Marco ultimately admitted the abuse, but told Jones that "[Wilson] only hits [Sarah] when she deserves to be hit." Wes repeatedly asked if his mother was hurt and worried that "[Wilson] was going to hit mom or something worse." At one point Jones and Mallett asked about their father's whereabouts. After Skyla responded that he was at a friend's house, Marco told her to "shut up" and that she was not supposed to reveal that information. Skyla retorted: "he'll beat us up and he'll kill us."

### 3. OCS's reunification efforts

OCS filed its Emergency Petition for Adjudication of Children in Need of Aid and for Temporary Custody on October 31, 2006. The superior court held a hearing on November 9 and granted OCS temporary custody of the children. The court ordered that Wilson and Sarah "shall work with the department in the development of a case plan and shall participate in family support services as set forth in that case plan."

Jones first approached the parents at the November 9 hearing, prior to even formulating a case plan. Wilson "indicated that there was no way that he would be willing to go to family violence intervention." During that same interaction Jones attempted to have Sarah sign a release of information. Wilson refused to allow Jones to speak to Sarah and put himself as a physical barrier between his wife and the social worker. Jones described Wilson as "very angry" and recounted that Wilson yelled at her both inside and outside the courtroom. Sarah told Jones not to talk

to Wilson. Jones testified that she was unable to "talk with them without that level of escalation" and that "[i]t was not a working relationship."

Jones developed the case plan for the parents. She found this difficult because she interpreted Wilson's prior interactions with her to mean that she was not allowed to contact Sarah or to contact him, except through his court-appointed attorney. Jones thus formulated the case plan without input from either Wilson or Sarah and did not attempt to contact them to try to negotiate any aspects of the case plan with them.

Sarah's portion of the case plan required her to engage in: (1) a Family Violence Intervention Program, for which OCS referred her to Alaska Family Services; (2) a parenting class, for which OCS again referred her to Alaska Family Services; (3) a psychological evaluation and any treatment recommended from such evaluation, for which OCS referred her to clinical psychologist Dr. Melinda Glass; (4) any regular mental health treatment indicated by her psychological evaluation; and (5) a substance abuse assessment and participation in any recommended treatment.

Wilson's portion of the case plan required him to engage in: (1) a substance abuse assessment; (2) a Family Violence Intervention Program, for which OCS referred Alaska Family Services; (3) a parenting class, for which OCS referred Alaska Family Services; (4) a psychological evaluation, for which OCS referred Dr. Glass; and (5) any mental health treatment prescribed following his psychological evaluation. All of these activities required Wilson and Sarah to sign releases of information.

The programs and services identified in the case plan required Wilson and Sarah to travel a significant distance from their home in Trapper Creek and many required Wilson and Sarah to pay, as OCS will not pay for all these services. It does not appear that any of these services were available to Wilson or Sarah in Trapper Creek or nearby Talkeetna.[2]

In addition to the formulation of the case plan, Jones arranged for supervised visitation for the parents to see their children. When Sarah told Jones that they could not afford the gasoline necessary to drive to the visitation, Jones arranged for a fifty dollar gas voucher. Soon after, Wilson cancelled the visitation and the gas card was never mailed.

On December 5 the parents came to see Jones to bring her their case plan signature pages. Wilson and Sarah both signed their respective case plans, but both checked the box indicating that they disagreed with their respective plans.

The case was then passed on to Mallett, who had earlier accompanied Jones to the initial removal, as the full-time social worker on the case. Mallett testified that despite the referrals she offered for the services prescribed in the case plan, both Wilson and Sarah refused to attend classes. In regard to the parenting classes, Sarah responded that she was unable to afford the gas to commute to class. Mallett offered Sarah the fifty dollar gas voucher previously authorized for Wilson and Sarah to be picked up at any time from OCS's office; Sarah never claimed the card. Wilson and Sarah indicated that they would engage in the substance abuse assessments only if they were ordered to do so by the court. Finally, Wilson and Sarah's respective attorneys requested that OCS wait to complete the psychological evaluations until Wilson and Sarah were ready.

Mallett set up a weekly phone appointment with Wilson and Sarah to communicate with them about their case plan and answer all their questions. The first week scheduled for their conversation Mallett forgot about the appointment. Wilson left angry and threatening messages for Mallett. Wilson and Sarah began to have the weekly phone calls with Mallett, but those calls soon devolved into brief conversations where Sarah would plead with Wilson to let her speak to Mallett and Wilson would force Sarah off the phone.

**2.** It is not disputed that Wasilla—where visitation was to occur and where services were available—is a long drive from Trapper Creek. Jones testified it was a 75 mile drive. Wilson contended that the round trip is 200 miles.

The parents were more willing to work with OCS to arrange visitation, but visitation coordination also became difficult and created many tense situations. Visitation was especially difficult to arrange because the agency with which OCS contracts to supervise visitation refused to supervise Wilson and Sarah with their children. The agency, Alaska Family Services, had learned of Wilson's prior violent threats. Although OCS typically does not supervise visits, Mallett arranged to have the guardian *ad litem* supervise a visit at her office on the condition that Sarah come without Wilson. The parents did not comply with this request and OCS employees spotted Wilson in the parking lot outside the office. Following that visit Wilson again began limiting Sarah's conversations with OCS and no further visitation was arranged.

The case was then reassigned to OCS social worker Bonni Glenn Harter approximately three weeks before the adjudication hearing. Wilson conceded that after Harter was assigned to the case she made active efforts.

### B. Proceedings

OCS filed an Emergency Petition for Adjudication of Children in Need of Aid and for Temporary Custody on October 31, 2006. Superior Court Judge Kari C. Kristiansen granted OCS temporary custody of the children on November 9, 2006.

The adjudication hearing took place on twelve days between March 16, 2007 and May 22, 2007. Judge Kristiansen heard testimony from nineteen witnesses including Wilson, Sarah, three OCS caseworkers, Dr. Glass, state troopers, and neighbors.

The court ruled from the bench, first finding that the children were Indian children within the meaning of the Indian Child Welfare Act [3] and therefore ICWA applied. The court then found:

The children are children in need of aid, and [the court is] comfortable saying with clear and convincing evidence as to Alaska Statute 47.10.011(8) [4] based upon the overwhelming evidence that [Wilson] has repeatedly abused [Sarah] in the home, and the conduct by or conditions created by [Sarah] and [Wilson] have resulted in mental injury and placed the children at risk of mental injury as a result of the domestic violence in the home.

Judge Kristiansen went on to make specific findings related to the injuries that Sarah suffered as a result of Wilson's violence. Following these extensive findings, the court found that Sarah "has failed to understand that the violence impacts her children in any way, and ... she significantly has not been able to recognize that she is a major part of this problem, as well, and she's testified that the children on occasion have witnessed the physical altercations."

Based on these factual findings and the testimony of Dr. Glass, who testified to the effect that children suffer when exposed to such domestic violence, the court concluded that "removal from the home is necessary based upon clear and convincing evidence ... that there will be serious emotional, physical damage based on this domestic violence in the home."

The court also made factual findings under the neglect section of the statute, AS 47.10.011(9).[5] Because "[a]t the time of the removal, all children wore very soiled clothing"; "[Skyla] at that time smelled of urine"; "[a]ll children had dental concerns, and [Skyla] needed dental surgery to address 14 out of 19 of her teeth that had bottle rot"; and "the children's hair were extremely matted," the court found by a preponderance of the evidence that the children were in need of aid under the neglect section of AS 47.10.011(9).

After determining the children were children in need of aid, Judge Kristiansen made detailed and explicit findings related to

---

**3.** 25 U.S.C. §§ 1901–1923, 1951 (2006).

**4.** AS 47.10.011(8) provides that the court may find a child to be in need of aid if the child has been subjected to conduct of a parent or guardian that results in mental injury to the child.

**5.** AS 47.10.011(9) provides that the court may find a child to be in need of aid if the child has been subjected to neglect.

OCS's obligation to make active efforts to provide services designed to prevent the breakup of an Indian family: [6]

> The court finds the department made timely reasonable efforts since the probable cause hearing to provide family support services to enable the safe return of the children, and further the court finds that active efforts were made to provide remedial services and rehabilitative programs to prevent the breakup of the family which were not successful. Both parents refused services that were offered to them despite direction from the court, and it is notable that since the beginning of this trial, the parents have significantly still been refusing the services, even with the aid of their counsel, and that the OCS workers have been trying to work with both [Wilson and Sarah] as well as their attorneys to try to come up with a suitable case plan and, simply put, the parents have just refused. [Wilson] and later [Sarah] unjustifiably refused to communicate with the department or assist in the development of their case plan. [Wilson] left a message for the department social worker that, quote, if a social worker stepped on my property, they would not leave alive, end quote. Both [Sarah] and [Wilson] testified that they refused to cooperate with the department.

> Active efforts includes the following: Department conducted psych evals for two children, therapy and counseling services for the children, transportation vouchers and cab offer to the parents for visitation and other issues, supervised visitation in a variety of venues, telephonic visitation managed through the department, sibling visitation every other week, referrals for domestic violence intervention program, domestic violence support group offered, referrals for parenting classes, completing physical exams of children, dental work for [Skyla], relative searches, parents with mental health followup treatment, offer for psychological evaluations, referrals for substance abuse assessments, clothing for the children, shelter offered for [Sarah], weekly telephone calls, contacts with the parents to address their ongoing concerns, which have still been unresolved based on the fallout of miscommunication.

Finally, the court made the requisite ICWA findings, concluding that "OCS has complied with the placement preferences and concerns of ICWA."

Wilson appeals the court's conclusion that OCS satisfied ICWA's active efforts requirement.

## III. STANDARD OF REVIEW

The question of whether OCS complied with the "active efforts" requirement of ICWA is a mixed question of law and fact.[7] We review the superior court's factual findings for clear error.[8] Such findings are clearly erroneous if we are "left with a definite and firm conviction based on the entire record that the trial court has made a mistake."[9] We review questions of law *de novo*.[10]

## IV. DISCUSSION

Wes, Marco, Dustin, and Skyla, as Alaska Natives, come under the protections of ICWA.[11] ICWA requires OCS to make "active efforts ... to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[12] Once OCS takes custody of Indian children it may retain custody only if it proves at the adjudication that these active efforts were unsuccessful.[13] Wilson challenges the superior court's finding that OCS met this ICWA requirement and made active efforts to provide him with the resources for his rehabili-

---

6.  *See* 25 U.S.C. § 1912(d) (2006).

7.  *Maisy W. v. State, Dep't of Health & Soc. Servs.*, 175 P.3d 1263, 1267 (Alaska 2008).

8.  *Id.*

9.  *J.S. v. State*, 50 P.3d 388, 391 (Alaska 2002).

10.  *See id.*

11.  *Id.*

12.  25 U.S.C. § 1912(d).

13.  *Id.*

tation in order to prevent the breakup of his family.[14]

■■ We generally find that OCS has made active efforts in cases in which "the state caseworker take[s] the client through the steps of the plan for reunification of the family."[15] We will decline to find active efforts where OCS develops a case plan, but "the client must develop his or her own resources towards bringing it to fruition."[16] The issue of whether OCS made active efforts is determined on a case-by-case basis.[17]

### A. The State Was Excused from Making Active Efforts After Wilson Refused To Cooperate with OCS and Threatened OCS Social Workers.

Wilson's appeal hinges on the argument that the state declined to make active efforts because his assigned caseworkers at OCS considered him threatening from their initial contacts with him and never reached out to him beyond those preliminary interactions. Their "hostility" towards him, as Wilson describes their behavior, inspired them only to make passive or token efforts for services that addressed his problems, specifically his abusive tendencies.

■■ If a parent has a long history of refusing treatment and continues to refuse treatment, OCS is not required to keep up its active efforts once it is clear that these efforts would be futile.[18] In *K.N. v. State*, we considered the willingness of the parent to complete the steps necessary for reunification in evaluating whether OCS met the active efforts requirement.[19] After one of the father's sons died while under his care, the state moved to terminate the father's rights to his other children.[20] The father initially refused to sign his treatment plan or submit to a psychological evaluation.[21] He ultimately submitted to the psychological evaluation under the threat of court sanctions and was diagnosed with paranoid schizophrenia.[22] The father contended that the state only had him undergo this evaluation in order to have his rights terminated.[23] In advising that even though the state could have done more to attempt to unify the family, we upheld the superior court's active efforts finding because "it [was] unlikely that further efforts by [the state] would have been effective in light of [the father's] attitude."[24]

We have similarly excused OCS from pursuing further active efforts in other cases where the parents have evinced no interest in cooperating with OCS. In *A.A. v. State*, we upheld an active efforts finding where the state failed to even make a case plan.[25] While explicitly noting that we did not condone the failure to create a case plan, we held that "although the [state's] efforts in relation to A.A. may have been relatively passive, A.A. demonstrated a lack of willingness to participate in treatment" and therefore the state satisfied ICWA's active efforts requirement.[26]

Wilson was more than simply uncooperative and difficult—he had a history of violent behavior and threatened OCS social workers. After finding that Jones had come to his property to investigate the claims that ulti-

---

14. Even though not an Alaska Native, Wilson is still covered under the protections of ICWA because his children are Alaska Natives. *K.N. v. State*, 856 P.2d 468, 474 n. 8 (Alaska 1993) ("The ICWA requirements apply even when ... [the state] is seeking to terminate the parental rights of a non-Indian parent.").

15. *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1219 (Alaska 2001) (quoting Craig J. Dorsay, *The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual* 157–58 (1984)); *see also A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999).

16. *A.A.*, 982 P.2d at 261.

17. *N.A. v. State*, 19 P.3d 597, 603 (Alaska 2001).

18. *See K.N.*, 856 P.2d at 477.

19. *Id.*

20. *Id.* at 471.

21. *Id.* at 472.

22. *Id.*

23. *Id.*

24. *Id.* at 477.

25. 982 P.2d 256, 262 (Alaska 1999).

26. *Id.*

mately led to the children's removal, Wilson called Jones's supervisor and threatened that if Jones returned to his home she would not leave the property alive. He also threatened to duct-tape any social workers that entered his property and leave them in the woods. He repeated these threats to Talkeenta troopers. Wilson continued to display this behavior following the removal of his children. When Mallett missed her first weekly telephone conference with Wilson and Sarah, Wilson left a message to the effect of "[Mallett] better watch [herself] because [she doesn't] know who he is and what he can do." Jones, who estimated that at the time she had completed about 150 investigations, testified that "[w]e've not had direct threats of this voracity ever in any removal I've done."

Moreover, Wilson was simply unwilling to cooperate with OCS. His past interactions with OCS show that he consistently refused OCS's services. OCS records and testimony reveal that he ignored OCS recommendations and refused OCS services in 1998, 2002, and 2003. In fact, in 2005, Wilson and Sarah refused to even allow OCS onto their property.

This pattern continued when OCS presented Wilson with the case plan at issue here. He stated flatly that he would not comply with three requirements (of the five included in the case plan) unless they were court-ordered: the psychological evaluation, the substance abuse assessment, and the domestic violence classes. Wilson contends that OCS should have sought the court order to have him undergo a psychological evaluation. Even putting aside our precedent which excuses further active efforts once the parent expresses an unwillingness to participate, requiring OCS to seek court orders for every uncooperative parent would put a huge and pointless burden on the department and the court system.

Moreover, Wilson was unwilling to even talk to the social workers. At the first hearing following removal of the children, he told Jones that she was not allowed to speak to him and yelled at her. Sarah explicitly instructed Jones not to talk to her husband. Wilson similarly refused to talk to Mallett when she was assigned to the case. Soon after Mallett established weekly telephone calls with Wilson and Sarah, Wilson refused to allow Sarah to speak to Mallett and forcibly ended conversations.

Finally, Wilson ignored OCS's instructions. For example, Mallett arranged supervised visitation at OCS's offices after Alaska Family Services, which usually conducted supervised visitation on a contract basis, refused to supervise visitation because of Wilson's earlier threats and actions. Mallett explicitly conditioned the visits on Wilson remaining away from the premises during the visits. But Wilson ignored the condition and was seen in the parking lot during Sarah's visitation, forcing cancellation of the visits.

Wilson threatened OCS social workers, consistently declined OCS services since 1998, explicitly refused to cooperate with his current case plan, cut off communication with OCS social workers, and disobeyed OCS's orders. He created the situation where it was difficult and dangerous for OCS to work with him to reunify him with his children.

### B. Despite Wilson's Refusal To Cooperate, OCS Continued To Make Active Efforts.

Despite Wilson's threats and refusal to cooperate with OCS, OCS still made active efforts to reunify the family and facilitate Wilson's treatment of his issues. Below, we examine a few of these examples of active efforts: providing gas vouchers, facilitating enrollment for prescribed classes, arranging supervised visitation at the OCS offices, and facilitating weekly telephone calls. These efforts, which continued even past Wilson's refusal to comply with requirements or cooperate with OCS, are more than sufficient to meet ICWA's active efforts requirement.

Because OCS was unable to offer services in Trapper Creek or Talkeetna, Jones offered Wilson and Sarah a fifty dollar gas voucher. Jones first offered the gas voucher for visitation purposes, but withheld mailing it after Wilson cancelled Sarah's visit. When Sarah later told OCS that she was unable to attend the parenting classes due to her inability to afford gas, Mallett again offered the gas card to Sarah for her and Wilson's use to

attend their prescribed classes. Sarah and Wilson never came to claim the gas card while Mallett was on the case. Harter ultimately provided the gas voucher to Wilson and Sarah approximately two weeks before the adjudication hearing.

Furthermore, OCS took active steps to ensure that Wilson and Sarah could enroll in and attend the parenting and domestic violence classes. Because there was a question of whether Wilson and Sarah would be able to afford such classes, Mallett testified that she discussed funding options with Wilson and Sarah for the domestic violence programs. She indicated it may be possible to secure funding through Sarah's tribe, through OCS, or through a "work-it-off" program run by Alaska Family Services. In addition to discussing funding options with Wilson and Sarah, Mallett contacted the parenting class referral on their behalf to learn the dates of the programs and other details. Mallett further testified that she did not contact the coordinator of the domestic violence classes because Wilson and Sarah indicated that they would attend those classes only if they were court-ordered. Mallett thus took active steps in approaching the funding issue, recognizing the financial instability of the parents, and took steps to enroll them in the one class that they expressed some degree of willingness to complete.

In addition, OCS arranged visitation between Sarah and her children even though such visitation was made difficult by Wilson's violent threats. As noted above, the OCS office in this case typically contracts out supervised visitation to Alaska Family Services. When Alaska Family Services refused to supervise visitation because of Wilson's prior actions, Mallett arranged supervised visitation for Sarah at the OCS office even though OCS typically does not supervise visits. Here, OCS went beyond its normal procedure to allow for visitation even though it was Wilson's behavior that precluded OCS from following its normal protocol of contracting out this supervised visitation to Alaska Family Services.

Mallett also made herself available at the same time each week to answer all of Wilson and Sarah's questions regarding their case.

Mallett admittedly missed the first meeting, but made herself available each week after that to answer questions. Mallett testified that, after the initial mishap, she and the parents were able to talk during these weekly phone calls. After some time, Mallett found that each week she would call and the phone call would last less than a minute before Wilson would end the call. When this pattern continued, Mallett then began to coordinate through the attorneys. Mallett's efforts to arrange a set time, call the parents, continue to attempt to have these weekly telephonic conferences despite the parties' lack of cooperation, and then pursue other routes of communication demonstrate active efforts by this OCS social worker.

Determining whether the state has made active efforts requires a very fact specific inquiry. The facts in this case overwhelmingly show that OCS workers, despite being threatened by a man with a violent past, made sincere but unsuccessful efforts to help Wilson address domestic violence problems.

## V. CONCLUSION

Because the superior court did not err in concluding that OCS complied with ICWA's "active efforts" requirement despite Wilson's unwillingness to participate in his case plan, we AFFIRM the superior court's finding that Wes, Marco, Dustin, and Skyla are children in need of aid.

MATTHEWS, Justice, not participating.