NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RONALD H., | ) | |
| | ) | Supreme Court Nos. S-16725/16855 |
| Appellant, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court Nos. 3KN-16-00040/ |
| | ) | 00041 CN |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH & SOCIAL SERVICES, | ) | MEMORANDUM OPINION |
| OFFICE OF CHILDREN'S SERVICES, | ) | AND JUDGMENT[*] |
| | ) | |
| Appellee. | ) | No. 1670 – March 28, 2018 |
| ANGELA A., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Charles T. Huguelet, Judge.

Appearances: Leif A. Thompson, Leif Thompson Law Office, Ketchikan, for Appellant Ronald H. Lance C. Wells,

---

[*] Entered under Alaska Appellate Rule 214.

Law Offices of Lance C. Wells, Anchorage, for Appellant Angela A. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Carolyn Perkins, Law Office of Carolyn Perkins, Salt Lake City, Utah, Guardian Ad Litem.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

A father and mother appeal the adjudication of their children as children in need of aid, arguing that the superior court's findings relied on untrustworthy testimony and misrepresented the father's testimony during the adjudication trial. In addition, they dispute the court's finding that the Office of Children's Services (OCS) made active efforts to prevent the breakup of the family. Lastly, they argue that the court erred by approving a change in the children's foster care placement in an order that did not include a 25 U.S.C. § 1912(e) finding. Because we find no error, we affirm the superior court's orders.

## II. FACTS AND PROCEEDINGS

### A. Removal, Case Plan Progress, And Visitation

Ronald H. and Angela A. have been in a relationship since January 2014.[1] Since the relationship began, Angela has accused Ronald of domestic violence on several occasions. She filed petitions for domestic violence protection orders in December 2014 and June 2015, and Ronald was arrested following domestic violence incidents that occurred in March and July of 2015.

Ronald and Angela have two children together: Alice, born in January 2015, and Harold, born in April 2016. Angela also has a third child: Andrew,

---

[1] We use pseudonyms throughout to protect the family's privacy.

born in January 2007. The Indian Child Welfare Act[2] (ICWA) applies to the children.

On January 31, 2016, a heated argument occurred between Angela and Ronald. Following the argument, Angela told Andrew to shut off the TV while Ronald was watching it. When Andrew did so, Ronald grabbed him, picked him up by his shirt, and slammed him into the floor. Angela — who was holding Alice in her lap — captured the incident on video. Ronald was arrested and ultimately convicted of assault in the fourth degree.[3]

OCS received a protective services report following Ronald's arrest. Because Ronald was jailed following the assault and was not expected to return to the home, OCS did not immediately take custody of the children. However, on May 13, OCS saw Angela's video and concluded that the children should be taken into custody. Andrew was removed from the home that day; Alice and the newborn Harold were taken into custody early the next morning. At a May 16 temporary custody hearing, the superior court found probable cause that the children were in need of aid and concluded that it would be contrary to their welfare to return them to the family home. The court encouraged OCS to find a way for Angela to have contact with the children but indicated that Ronald should have "very limited contact" with them.

An OCS caseworker held an initial case conference with Ronald and Angela in June and met with them several times in the following months. However, he did not develop a written case plan until September 6. The case plan tasked Ronald and

---

[2]    25 U.S.C. §§ 1901-1963 (2012). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

[3]    AS 11.41.230(a) ("A person commits the crime of assault in the fourth degree if . . . (3) by words or other conduct that person recklessly places another person in fear of imminent physical injury.").

Angela with understanding and fulfilling their children's needs and with protecting them from domestic violence. To meet these goals, the case plan required Angela to receive a mental health assessment, attend a domestic violence support group, participate in parenting classes, and work with a tribal social services program. It required Ronald to participate in a behavioral health assessment, attend parenting classes, and participate in a batterer's intervention program. The plan indicated that OCS would support Angela and Ronald by providing referrals and transportation to recommended treatments, providing financial assistance for assessments, communicating with tribal family services, and supervising visitation. Some of these activities had been suggested to the parents prior to their first meeting with the caseworker; others had been suggested by the caseworker prior to development of the written case plan.

Ronald and Angela made progress following their case plan. Both began attending parenting classes. Angela also began attending domestic violence classes, and Ronald attended some of these classes with her. Ronald completed a mental health assessment; Angela attended sessions at a mental health center and was placed on a waiting list for an assessment. However, the parents struggled with other aspects of the case plan. Both refused to sign releases of information requested by the caseworker. Ronald refused to attend the recommended batterer's intervention program because he believed the program was for convicted criminals and repeat offenders. Ronald also failed to complete additional psychological testing that was recommended following his mental health assessment.

Soon after the children were removed, visitation was scheduled for Angela with all three children, and for Ronald with his two children. Both attended supervised visitations regularly. The parents had healthy, positive interactions with the children and were initially able to develop rapport with their visitation supervisor.

Over time, however, the parents' relationship with OCS began to deteriorate. When Ronald was reminded of visitation rules, he became combative and swore at the visitation supervisor. On one occasion, Ronald told Harold that OCS was attempting to kidnap him. Ronald also implied that he would like to commit acts of violence at the OCS office. Additional OCS workers became involved in the case in an attempt to mitigate Ronald's outbursts. While Angela was less overtly hostile, the visitation supervisor felt that both parents tried to "intimidate [him] physically and emotionally." Ronald's and Angela's halting progress on their case plan and hostile interactions with OCS led their caseworker to conclude that the parents were not making changes in behavior that would indicate progress on their case plan and led OCS to conclude that the children would be at risk if returned to their parents' custody.

## B.    Adjudication Trial, Disposition Hearing, And Status Hearing

A three-day adjudication trial commenced on September 20, 2016, and concluded on October 11. On January 4, 2017, the superior court issued an order finding that Andrew, Alice, and Harold were children in need of aid. The court found that: (1) Ronald assaulted Andrew on January 31, 2016; (2) there was a history of domestic violence between Ronald and Angela; and (3) domestic violence had occurred in front of one or more of the children. Based on these findings, the judge found that the children were in need of aid under AS 47.10.011(8)(A) (mental injury) and (B) (risk of mental injury).[4] The court also found that Andrew was a child in need of aid under

---

[4]    For the latter finding, the court relied on AS 47.10.011(8)(B)(iii), which states that "repeated exposure to conduct by a household member . . . against another household member that is a crime under AS 11.41.230(a)(3) or 11.41.250–11.41.270 or an offense under a law or ordinance of another jurisdiction having elements similar to a crime under AS 11.41.230(a)(3) or 11.41.250–11.41.270" supports a finding that a child is in need of aid. Alaska Statute 11.41.230(a)(3) defines one form of assault in the
(continued...)

AS 47.10.011(2) (parental incarceration), as his father remained in prison.[5]

A disposition hearing occurred on February 23. The court had continued the hearing so that OCS and the guardian ad litem could submit predisposition reports; the guardian ad litem completed her report, but OCS did not. The judge made interim disposition findings until all predisposition reports and objections could be filed.

OCS filed its predisposition report on March 15; a status hearing was held the same day. At the hearing, the guardian ad litem stated that OCS was planning to transfer the children to live with their aunt. Ronald opposed the transfer, and requested a placement review hearing. The judge elected to address the placement issue immediately. Angela indicated she did not oppose the transfer. The guardian ad litem favored the transfer, explaining that it was best for the children to be with family. Ronald testified that he thought the proposed placement was too far away, unfamiliar to the children, and possibly unsafe and that Angela had made sufficient progress for the children to be returned to her. After Ronald testified, the judge stated that "the department's decision to move the child[ren] to the aunt, which is ICWA-compliant, is [not] an abuse of discretion" and could "take place as soon as possible."

On May 18 the court issued three orders: two disposition orders and an "Order Following Placement Review Hearing." One of the disposition orders dealt with the February 23 disposition hearing, the other with the March 15 status hearing. Both included the following findings: (1) the parents had been offered mental health assessments and counseling, parenting classes, domestic violence counseling and classes, and transportation assistance; (2) the parents had been offered visitation; and (3) OCS

---

[4]    (...continued)
fourth degree; AS 11.41.250 defines reckless endangerment. Alaska Statute 11.41.260 and AS 11.41.270 define stalking offenses that are not relevant to this case.

[5]    Andrew's father is not a party to this appeal.

had developed a case plan and held an additional meeting to determine how best to handle the case. Based on these findings, the superior court found that OCS had made active efforts to prevent the breakup of the family and ordered the children committed to OCS custody for up to two years.

The "Order Following Placement Review Hearing" stated Ronald had not demonstrated that the proposed placement change would be contrary to the children's best interests and that the placement could be changed "as soon as possible." The Order did not include a finding as required by 25 U.S.C. § 1912(e) that returning custody to the parents would result in serious emotional or physical damage to the children. However, both disposition orders included a § 1912(e) finding.

Ronald timely appealed from the disposition and adjudication orders as they pertained to Alice and Harold, but not to Andrew. Angela joined Ronald's briefing. They argue that the superior court erred by: (1) adjudicating Alice and Harold children in need of aid; (2) finding at disposition that OCS made active efforts in providing remedial services to prevent the breakup of the family; and (3) approving the change in foster care placement in an order that did not include a § 1912(e) finding.

## III. DISCUSSION

### A. The Superior Court Did Not Clearly Err In Finding Alice And Harold Children In Need Of Aid.

The superior court adjudicated Alice, Harold, and Andrew children in need of aid under AS 47.10.011(2), (8)(A), and (8)(B)(iii). OCS acknowledges that "the CINA findings under AS 47.10.011(2) and (8)(A) were probably regarding Andrew" rather than Alice and Harold.[6] Because Ronald and Angela have "only appealed

---

[6]   Alaska Statute 47.10.011(2) applies when a parent is incarcerated; AS 47.10.011(8)(A) applies when a child has suffered an actual mental injury. Andrew
(continued...)

regarding [Ronald's] biological children" — Alice and Harold — we must determine whether the superior court's finding that Alice and Harold are children in need of aid under AS 47.10.011(8)(B)(iii) was clearly erroneous.

Whether a child is in need of aid is a factual finding that we review for clear error.[7] A finding is clearly erroneous if "a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[8] We "ordinarily [will] not overturn a superior court's findings based on conflicting evidence,"[9] and we "give particular deference to the trial court's factual findings when . . . they are based primarily on oral testimony."[10] Lastly, we note that a court's error may be harmless where other evidence in the record is sufficient to support its findings.[11]

Ronald and Angela first argue that the superior court clearly erred in finding the children in need of aid "because it based the bulk of its evidence of domestic violence on [Angela's] testimony." The parents acknowledge that Ronald assaulted

---

[6]      (...continued)
suffers from a major depressive disorder, and his biological father is scheduled to be incarcerated until 2057.

[7]      *Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 353 P.3d 831, 837 (Alaska 2015).

[8]      *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774 (Alaska 2012) (quoting *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

[9]      *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004).

[10]      *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007).

[11]      *See Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 340 (Alaska 2011).

Andrew on January 31 but claim that all other evidence of domestic violence was based on Angela's testimony in court or accounts of abuse she presented to other people. And because Angela is "clearly untrustworthy," they claim there was insufficient evidence to conclude that there were repeated instances of domestic violence as required under AS 47.10.011(8)(B)(iii).[12]

As evidence of Angela's untrustworthiness, the parents cite inconsistencies in Angela's accounts of the July 2015 incident and the absence of corroborating physical evidence of that incident. They also claim that infidelity on Ronald's part might have provided an incentive for Angela to file false reports. These arguments, without more, do not convince us that the superior court's CINA finding was clearly erroneous.

"We have consistently held that 'it is the role of the trial court, and not this court, to judge the credibility of any witnesses and to weigh conflicting evidence.' "[13] In the past, Angela had made various reports to law enforcement and in court documents alleging that Ronald had slapped her, threatened to kill her, pushed her, pulled her hair, and twisted her breast. At the adjudication trial, Angela denied that those statements were "lie[s]" and expressly reaffirmed some of them. She further testified that some of the incidents had occurred in front of the children. The court's conclusion that repeated instances of domestic violence occurred was "based primarily on [Angela's] oral testimony" and is thus entitled to "particular deference."[14] The testimony supports the superior court's conclusion that Ronald has committed multiple acts of domestic

---

[12]     *See supra* note 3.

[13]     *Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 617 (Alaska 2007) (quoting *Martin v. Coastal Vills. Region Fund*, 156 P.3d 1121, 1129 (Alaska 2007)).

[14]     *Josephine B.*, 174 P.3d at 222.

violence; the mere existence of conflicting evidence in the record does not render that conclusion erroneous.

Ronald and Angela next argue that the court clearly erred in its description of Ronald's testimony during the adjudication trial. In its findings of fact, the court stated that Ronald "testified about his criminal assault history in . . . Missouri, Arkansas and New Jersey" and about an arrest in Washington for assault. The court also stated that Ronald testified he "viewed his assault on [Andrew] . . . as discipline." The parents argue that these statements misconstrued Ronald's testimony; they claim that Ronald did not testify he had a criminal assault history in either Missouri or New Jersey, that he did not admit he was arrested in Washington for assault, and that he never said he viewed the assault on Andrew as discipline.

Our review of the record suggests that the superior court may have misconstrued some parts of Ronald's testimony.[15] But even if the court's descriptions of Ronald's testimony were erroneous, we conclude that those errors were immaterial.[16] Whether Ronald understood the January 31 assault as "discipline" has no bearing on whether Alice and Harold are children in need of aid under AS 47.10.011(8)(B)(iii), which focuses on the children's repeated exposure to acts of domestic violence committed by one member of their household against another. Ronald's criminal history from other states, which predates both children's births likewise has no bearing on this

---

[15]     While Ronald testified about an out-of-state assault conviction, the conviction occurred in Arkansas — not Missouri or New Jersey. Furthermore, he testified that he was arrested in Washington because he had an outstanding warrant from Missouri, not because he committed assault. Lastly, although an OCS worker testified that Ronald viewed the assault on Andrew "as discipline," Ronald's testimony does not indicate that he viewed it that way.

[16]     *See Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 349 (Alaska 2016).

finding. Ronald's testimony concerning these issues was a "harmless side note" to the central question — whether Alice and Harold had been exposed to domestic violence in Ronald and Angela's home.[17] Furthermore, "there was sufficient other evidence in the record to support the superior court's conclusion" that Alice and Harold were children in need of aid: Angela's testimony and out-of-court statements established that she had experienced domestic violence on multiple occasions and that the children were present on some of those occasions.[18] Any errors in the court's description of Ronald's testimony were harmless and thus do not constitute grounds for reversal.[19]

## B. The Superior Court Did Not Clearly Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Family.

Ronald and Angela argue that OCS did not make active efforts to prevent the breakup of their family as required by the CINA rules and ICWA.[20] "Whether OCS made active efforts . . . is a mixed question of law and fact."[21] "We review the content of the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[22] We reverse factual findings "only if, after 'a review of the entire record in the light most favorable to the party prevailing below,' we are left 'with a definite and firm conviction that a mistake

---

[17]    *Wendell C. II v. State, OCS*, 118 P.3d 1, 5 (Alaska 2005).

[18]    *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 340 (Alaska 2011).

[19]    *See id.*; *see also Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1105 (Alaska 2011).

[20]    25 U.S.C. § 1912(d) (2012); CINA Rule 17(c).

[21]    *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526 (Alaska 2013).

[22]    *Id.*

has been made.' "[23] " '[N]o pat formula' exists for distinguishing between active and passive efforts."[24] However, "[i]n general, active efforts will be found when OCS 'takes the client through the steps of the plan rather than requiring that the plan be performed on its own,' but not when 'the client must develop his or her own resources towards bringing [the plan] to fruition.' "[25]

Ronald and Angela first argue that OCS did not provide a written case plan in a timely fashion. OCS's failure to provide a formal case plan until September 6, 2016 — almost four months after the children were removed — was a significant lapse; both OCS policy and federal law indicate that a case plan should be provided within 60 days of removal.[26] However, when evaluating active efforts, we look "to the state's involvement in its entirety."[27] Here, while the caseworker finalized the case plan well

---

[23] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 761 (Alaska 2009) (quoting *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 672 (Alaska 2008)).

[24] *Philip J.*, 314 P.3d at 527 (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[25] *Id.* (second alteration in original) (footnote omitted) (first quoting *N.A. v. State, DFYS*, 19 P.3d 597, 602-03 (Alaska 2001); then quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)).

[26] *See* ALASKA DEP'T OF HEALTH & SOC. SERVS., OFFICE OF CHILDREN'S SERVS., CHILD PROTECTIVE SERVICES MANUAL § 2.9.1 (2016) (citing 45 C.F.R. § 1356.21(g) (2016)), http://dhss.alaska.gov/ocs/Documents/Publications/CPSManual/cps-manual.pdf ("A case plan must be developed within 60 days of when a child is removed from home.").

[27] *Philip J.*, 314 P.3d at 527 (quoting *Lucy J.*, 244 P.3d at 1114); *see also E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002) (concluding State's failure to make active efforts for half a year was "insignificant in light of the extensive remedial efforts" State provided at other times).

past the appropriate deadline, it appears that at least some steps formalized in the September case plan had been communicated to the parents earlier. And we have previously found that the active efforts requirement can be satisfied even when OCS improperly delayed development of a case plan.[28]

Ronald and Angela further argue that OCS did not adequately assist Ronald because OCS failed to find a psychologist for his psychological evaluation; provide alternative programming for the batterer's intervention program; and address Ronald's concerns about the program, including the time and expense of attending. Although OCS could have provided additional assistance to help Ronald complete his psychological evaluation and his batterer's intervention program, we have consistently held that OCS's efforts to prevent a breakup need only be "active," not "ideal."[29] As the superior court noted, OCS developed a case plan; referred the parents to mental health assessments, parenting classes, and domestic violence classes; offered to provide transportation to these services; provided visitation with the children; and held a team decision meeting to determine the best path toward reunification. The record further indicates that OCS referred Ronald to a batterer's intervention program; met with both parents many times to address concerns; and assigned additional workers, including a supervisor, to the case in an attempt to reduce tensions. While no "pat formula" exists

---

[28] *See Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 844-45, 849-50 (Alaska 2009) (case plan not developed until almost two years after OCS assumed custody of children); *T.F. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 26 P.3d 1089, 1090, 1095-96 & n.28 (Alaska 2001) (custody assumed in July 1999 but formal case plan not finalized until March 2000).

[29] *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 107 (Alaska 2017).

for determining whether OCS has made active efforts, OCS's efforts in this case are analogous to efforts that have been found to justify active efforts findings in past cases.[30]

Ronald's and Angela's remaining arguments are unconvincing. First, they claim that there was an unreasonable delay between removal and the initial case conference. Even though OCS did not schedule an initial case planning conference with the worker who was responsible for working with the family throughout the court proceedings, other OCS workers provided services to the family before that time. Before their case was transferred to the new caseworker, the parents had worked with OCS to arrange mental health assessments and parenting classes, and to schedule visits with the children. By the time the parents met with their new caseworker at the initial case planning conference, they had already contacted the treatment and education agencies and participated in visitation. Next, they argue that the disposition hearing was unreasonably delayed. However, the court's postponement of the disposition hearing has no bearing on whether OCS made active efforts to prevent the breakup of the family.

Finally, we note that "a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts," and we have excused "further active efforts once the parent expresses an unwillingness to participate."[31] The record indicates that Ronald did not participate in

---

[30]     *See, e.g.*, *Philip J.*, 314 P.3d at 527 (assisting with case planning, offering transportation, and attempting to provide mental health counseling and substance abuse treatment); *Lucy J.*, 244 P.3d at 1114 (allowing visitation, offering transportation, helping parent secure housing, and providing mental health services, parenting classes, substance abuse treatment, and tribal counseling); *N.A.*, 19 P.3d at 603 (allowing visitation with children, arranging transportation for visitation, and providing parenting classes, psychiatric evaluation and treatment, and substance abuse treatment).

[31]     *Philip J.*, 314 P.3d at 528 (first quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008); then (continued...)

further psychological evaluation that was recommended after his mental health assessment, nor did he participate in the batterer's intervention program that was included in his case plan. Rather than working with OCS, Ronald yelled and swore at OCS workers when asked to adhere to visitation rules and intimated that he wished to commit violence against them. Ronald's unwillingness to fully participate in his case plan and his hostility toward OCS provide further support for the court's active efforts finding.[32]

## C. The Superior Court Did Not Err By Approving A Change In The Children's Foster Care Placement Without Making A 25 U.S.C. § 1912(e) Finding.

Under 25 U.S.C. § 1912(e), a court cannot order foster care placement of an Indian child "in the absence of a determination . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." And under 25 U.S.C. § 1916(b), a court must make a § 1912(e) finding "[w]henever an Indian child is removed from a foster care home or institution for the purpose of further foster care."[33] Ronald and Angela's final argument on appeal is that the court did not make the required § 1912(e) finding prior to approving the change in placement. OCS responds that while the order that approved the placement change

---

[31]    (...continued) quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 102 (Alaska 2008)).

[32]    *See id.* at 530-32 (holding that active efforts requirement was satisfied in part because parent failed to participate in offered services after receiving referrals from OCS); *Wilson W.*, 185 P.3d at 102 (holding that active efforts requirement was satisfied in part because parent "created the situation where it was difficult and dangerous for OCS to work with him to reunify him with his children").

[33]    *See Dep't of Human Servs. v. J.G.*, 317 P.3d 936, 947-48 (Or. App. 2014) (construing § 1916(b) as requiring courts to make a § 1912(e) finding when transferring a child from one foster care home to another).

— the "Order Following Placement Review Hearing" — does not include a § 1912(e) finding, one of the two disposition orders from the same hearing issued on the same day as the placement change order did contain the required finding. Whether the finding in the disposition order satisfied the requirements of 25 U.S.C. § 1912 and § 1916 is a legal question that we review de novo.[34]

We agree with OCS that there was no reversible error. The parents argue that the superior court did not make a § 1912(e) finding in an order resulting from the March 15 hearing. But one of the two disposition orders — which includes a § 1912(e) finding — clearly concerned the March 15 status hearing, at which both disposition and foster placement issues were discussed.[35] This order satisfied the requirements of § 1912(e) and § 1916(b).

And even if there were error, it would be harmless. We have generally allowed trial courts to "rectif[y] . . . initial oversight[s]" by entering subsequent orders that remedy errors or deficiencies in an initial order.[36] In *Sandy B. v. State*, *Department*

---

[34] *See Philip J.*, 314 P.3d at 526.

[35] The parents' argument is based in part on the fact that the effective date for the disposition order is February 23, 2017, the date of the disposition hearing, rather than March 15, the date of the status hearing. They also rely on a finding included in the disposition order: "OCS has established good cause to deviate from the placement preferences of 25 U.S.C. § 1915 because a search was conducted for homes within the placement preferences and none were found. However, the Department is exploring placement with the maternal aunt who lives in Wasilla." The parents reason that this finding must refer back to the February 23 hearing, as placement with the aunt was addressed and resolved at the March 15 hearing. The parents' argument is undermined by the introductory paragraph of the disposition order, which expressly states that the order relates to the "Status Hearing/Continued Disposition Hearing on March 15, 2017," and we therefore reject the argument.

[36] *D.H. v. State, Dep't of Health & Soc. Servs.*, 929 P.2d 650, 654-55 (Alaska
(continued...)

*of Health & Social Services, Office of Children's Services*, for instance, a trial court entered a second order finding that OCS had made active efforts to prevent the breakup of an Indian family.[37] We concluded that "it is clear that the trial court made the required active efforts finding," despite the fact that the initial order did not include that finding.[38] Similarly, we have permitted trial courts to remedy deficiencies in their oral rulings on the record by entering written orders addressing those deficiencies.[39] Thus, we conclude that the superior court's failure to include a § 1912(e) finding in the placement change order was not a fatal error; the disposition order containing the § 1912(e) finding rectified any oversight the superior court committed by neglecting to include the finding in the placement change order itself.

## IV.   CONCLUSION

We AFFIRM the superior court's adjudication of Alice and Harold as children in need of aid, its disposition orders, and its order approving a change in the children's foster placement.

---

[36]   (...continued)
1996).

[37]   216 P.3d 1180, 1187-88 (Alaska 2009).

[38]   *Id.*

[39]   *See Judith R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 896, 901 (Alaska 2012) (noting that oral ruling did not include required best interests analysis); *Nada A. v. State*, 660 P.2d 436, 439 (Alaska 1983) (noting that oral ruling misstated requirements for abandonment finding), *superseded by statute on other grounds*, Ch. 99, §§ 1(b)(2)(B), 18, SLA 1998; *see also K.T.E. v. State*, 689 P.2d 472, 477 (Alaska 1984) ("Generally, where inconsistencies exist between a court's written findings and its oral statements, the written findings control."). These cases also address another of the parents' arguments: that the court's oral ruling during the hearing that the move could take place "as soon as possible" was issued before any § 1912(e) findings were made and was thus invalid.